ROBERT B. WHITE, PLAINTIFF-RESPONDENT, v.
TOWNSHIP OF NORTH BERGEN, DEFENDANT-APPELLANT.

Argued October 31, 1977—Decided September 14, 1978.

*Mr. Leon S. Wolk* argued the cause for appellant.

*Mr. Sidney I. Turtz* argued the cause for respondent.

The opinion of the Court was delivered by

HUGHES, C. J. This case involves the application of a statute so pivotal to the controversy we consider on this appeal, that we quote its relevant substance at once. *N. J. S. A.* 40A:9–172 provides as follows:

Whenever any municipal officer or employee shall be \* \* \* dismissed from his office, employment or position and such \* \* \* dismissal shall be judicially determined to be illegal, said officer or employee shall be entitled to recover his salary from the date of such \* \* \* dismissal \* \* \*.

The plaintiff-respondent (the employee) was the duly appointed Tax Assessor of the Township of North Bergen (the municipality), having been appointed to a term which would have ended on June 30, 1972. His status was accurately described in his brief as follows:

The Tax Assessor is a municipal employee and so far as Civil Service status is concerned, he is in the unclassified service. He does not enjoy so-called "tenure of office" protection, but merely a right, at most, to claim the office and the emoluments thereof for the unexpired portion of the term.

On July 18, 1969, the municipality dismissed him from his position for specified cause, the nature of which is not relevant here. He brought an action to challenge that dismissal and in due course, on August 9, 1972, it was determined by a trial court to have been illegal, a decision later tested and upheld on appeal. He then resorted to the above statute to claim an award of his back salary. Since his term had expired before his judicial vindication, reinstatement to his position is not here involved.

The municipality resisted his claim and this litigation ensued. At trial the municipality advanced a single issue, namely that the statutory right to back salary declared in the above statute is subject to mitigation by earnings which the employee enjoyed in other employment activities during the period of his dismissal, that is to say until the natural ending of his term of office. These earnings were quite substantial though their precise extent was in dispute. They were contended by the employee to have been $38,748.22 and by the municipality, $57,419.82. The trial judge did not make factual findings of the exact amount of earnings. However (and most astutely), because he foresaw at least the possi-

bility of change in existing judicial application of the statute, the judge held a plenary hearing "to spread on the record the facts relating to mitigation in the event the Supreme Court is requested by appropriate appeal to reconsider its holding in *McGrath* [*McGrath v. Jersey City*, 38 N. J. 31 (1962), *infra*]."

In this posture the trial judge, reluctantly (because he did not believe such result to be right and just) and only in deference to the principle of *stare decisis*, and its relevance in the context of existing New Jersey decisions applying the statute, entered judgment for the employee for some $44,000, the full and undiminished amount of the public salary which he would have enjoyed but for his dismissal.

The majority in the Appellate Division, affirming, shared the trial judge's discontent with the result invoked by application of the rule of *stare decisis*, and said:

A change in the law must come either from the Supreme Court or the Legislature.

The dissenting member, Judge Allcorn, believed that the statute, if applied as hitherto in New Jersey law, would amount to a municipal gift and be violative of the Constitution,[1] and therefore that the statute should not be so interpreted. He would have interpreted and applied the statute to embrace the common law mitigation rule, to save the statute's constitutionality. He recognized the obligation of a court to "strain" to uphold a legislative act, as did Justice (then Judge) Pashman in *New Jersey Sports & Exposition Auth. v. McCrane*, 119 *N. J. Super.* 457, 476 (Law Div. 1971), *aff'd* 61 *N. J.* 1, *appeal dismissed* 409 *U. S.* 943, 93 *S. Ct.*

---

[1]No county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of, any stock or bonds of any association or corporation. [*N. J. Const.* (1947), Art. VII, § III, par. 2].

270, 34 *L. Ed.* 2d 215 (1972), upon the thesis that "[t]he duty of the court is to strain if necessary to save the act [rather than] to nullify it." This upon the general and salutary principle of respect to the Legislature, expressed so long ago by Chief Justice John Marshall, sitting at circuit in *Ex parte Randolph,* 20 *F. Cas.* 242. 254 (C. C. D. Va. 1833) (No. 11,558). There he stated:

> No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.

The municipality's appeal comes to this Court as of right. *R.* 2:2–1(a)(2).

We therefore confront several fundamental questions involving (1) the stability of the law as supported by the rule of *stare decisis,* and the implications and propriety of withholding application of that principle in the case before us; (2) the nature and history of the statute itself, as accommodating, *vel non,* its interpretation from the standpoint of legislative intent; (3) whether such interpretation under the circumstances would trench upon the province of the Legislature, and (4) depending upon the answers to these questions, whether judicial action to consider the common law rule of mitigation of loss of earnings to be implicit in the statute is here warranted. Consideration of these problems, we think, should begin with the history, nature and purpose of the statute as previously dealt with in New Jersey cases.

I.

## THE STATUTE AS HERETOFORE APPLIED

The present law in New Jersey dealing with the above statute is generally reflected in three leading cases, *McGrath*

*v. Jersey City,* 70 *N. J. Super.* 143 (Law Div. 1961), *aff'd* 38 *N. J.* 31 (1962); *D'Elia v. Jersey City,* 57 *N. J. Super.* 466 (App. Div. 1959); *Morrissey v. Holland,* 79 *N. J. Super.* 279 (Law Div. 1963), in turn based upon long-standing precedent. *See, e. g., Ratajczak v. Board of Educ.,* 118 *N. J. L.* 311 (Sup. Ct. 1937), *aff'd* o. b. 119 *N. J. L.* 433 (E. & A. 1938). The sense of these decisions is this:

In *Ratajczak* the court dealt with a predecessor of the above statute of similar language, and held that the Legislature thereby intended "to change the rule of the common law * * * to confer on an excluded officer or employe adjudged to have been so excluded illegally, the right to his salary, whether he worked for it or not, *whether he earned money outside or not,* and whether the work he would have done if not so excluded, was or was not done by some *de facto* substitute." 118 *N. J. L.* at 312 (emphasis added). The contingency underlined was not in the case factually and therefore the decision, as extended to *it,* must be regarded as *dictum.* Nevertheless, although conceded to be such, it was the underpinning of the first case directly confronting the issue, *D'Elia v. Jersey City, supra.* There the court held that the purpose of the statute was "to eliminate from the law the harsh common-law rule that the right of a public officer to receive or recover wages is dependent entirely upon the performance of service," 57 *N. J. Super.* at 468, and that the corrective statutory rule to recover the salary of his office or employment for the period covered by the illegal dismissal was unconditional in nature and not subject to mitigation by other earnings *ad interim. Id.* at 468–70. The court thought such right to be conferred by the statute in "words of such clarity that they can have but one meaning," and that in such case "[a]ttributing to them a meaning other than that which is so plainly expressed would be a gross invasion of the legislative prerogative in this area of the social sphere." *Id.* at 470. The holdings in *Morrissey, supra,* and *McGrath, supra,* followed this concept.

In *DeMarco v. Board of Chosen Freeholders*, 21 *N. J.* 136 (1956), the "harsh common law rule" referred to was traced by Justice Jacobs, who identified decisions then spanning almost a century, stating "principles which have become firmly imbedded in the common law of our State," (21 *N. J.* at 140) clearly equating the right to recover salary to a claim for compensation growing *"out of the rendition of the services."* 21 *N. J.* at 141 (quoting from *Hoboken v. Gear*, 27 *N. J. L.* 265, 279 (Sup. Ct. 1859) (emphasis in original)). Such was the rule in New Jersey despite the majority view at common law that a public officer who was illegally prevented from performing the duties of his office could recover his salary without mitigation, whereas a public employee's recovery in the same situation would be subject to the doctrine of mitigation by any outside earnings. The rationale for this distinction between officers and employees was the view that an officer's right to compensation does not arise out of a contract but *ex lege* and therefore belongs to the officer as incident to the office. And that he is therefore entitled to that compensation regardless of any other income he earned while deprived of the public office. 4 *McQuillin, Municipal Corporations,* § 12.186 at 54–56 (rev. 3d ed. 1968); Annotation, "Earnings or opportunity of earning from other sources as reducing claim of public officer or employee wrongfully excluded from his office or position," 150 *A. L. R.* 100, 102–03 (1944); 63 *Am. Jur.* 2d, *Public Officers and Employees* §§ 401–02 at 874–75 (1972).

The clear rejection of this view under New Jersey common law was based upon the distaste of our courts for the notion accepted in many other states that there was a right to salary which was incident to the public office and which "belonged" to that public officer. But the "harsh common law rule" in New Jersey, precluding any recovery of salary except that earned by rendition of service, on the part of public officers, was not held applicable to actions by other public employees who were not public "officers." *Ross v. Board of Chosen Freeholders*, 90 *N. J. L.* 522 (E. & A. 1917). Rather, such

"employees" could recover back salary when wrongfully discharged or suspended, but the recovery was subject to the general common law doctrine of mitigation. *Miele v. McGuire*, 31 *N. J.* 339, 348–52 (1960); *Miller v. Board of Chosen Freeholders*, 10 *N. J.* 398, 407–09 (1952).

■ ■ "Mitigation of damages" is defined as "[a] reduction of the amount of damages * * * [based on] facts which show that the plaintiff's conceded cause of action does not entitle him to so large an amount as the showing on his side would otherwise justify * * *." *Black's Law Dictionary* 1153 (rev. 4th ed. 1968). Thus, in the context of "making whole" an injured party, a purely compensatory concept as distinguished from punitive damages, certain acts or failures to act of that party are taken into account in computing the amount of his recovery. By way of example, this Court has recently held that, in the interests of fairness and equity, a landlord seeking to recover rents due from a defaulting tenant has a duty to mitigate his damages by seeking another tenant. *Sommer v. Kridel*, 74 *N. J.* 446, 456–57 (1977). It is this same concept of compensating or making whole the wrongfully ousted employee that underpinned the common law mitigation rule affecting his right to recover. To that extent the statute as hitherto construed involves dual compensation, which as pointed out in *D'Elia, supra,* has not gone unnoticed by our courts. In *Bianchi v. City of Newark,* 53 *N. J. Super.* 66, 72 (App. Div. 1958) the court, in speaking of this statute, observed:

It may well be that a dismissed employee had been gainfully employed during the period of his separation from municipal service, in which case his recovery of back salary would be nothing less than a windfall. Another possibility is that the municipality may have replaced him, paid the substitute, and then found itself faced with the necessity of making a second payment when visited with a judgment for back salary.

In his dissent below, Judge Allcorn attributed a significance beyond the concept of "windfall." He perceived constitutional fault in

statutes which authorize or direct that the wrongfully discharged public employee shall recover his full salary or other compensation for the entire period he was unlawfully deprived of his public employment, without regard to any recoupment by him of part or all of the amount of such salary or other compensation as a result of remuneration earned by him from other employment during that period. To the extent of such recoupment from other sources, the loss of earnings has been restored, his damages have been reduced. To the same extent, the payment in full to him of his salary or other compensation by the public employer for the period cannot be legally justified. It cannot be justified as damages; the earnings from his public employment of which he was deprived have been replaced pro tanto. Neither can it be otherwise justified; he performed no services for and supplied no other consideration to the public employer.

In short, the payment of such amount by the public employer in these circumstances is much more than the "windfall" it was characterized to be by this court in *Mullen v. Bd. of Ed. of Jefferson Tp.,* 81 *N. J. Super.* 151, 160 (App. Div. 1963). It is plainly and simply a gift, a donation of public monies. As such, payment thereof by the public employer is proscribed and authorization therefor by the Legislature is prohibited by the express terms of Article VIII, section III, paragraph 2 of the New Jersey Constitution. [footnote omitted].

The distinction in New Jersey decisions between an office derived *ex lege* and a position of employment arising *ex contractu* was thought by Justice Jacobs, writing for this Court in *Miele v. McGuire, supra,* 31 *N. J.* at 347, to be based upon "somewhat obscure and rather unfortunate lines." Nevertheless, the distinction was real enough in 1918 when the earliest predecessor of the present statute was enacted. *L.* 1918, *c.* 139. On its face it blurred the distinction between officers and employees by its reference to both as beneficiaries of the remedy provided: "Whenever any municipal officer or employee shall have been illegally dismissed * * *."

But if the harsh common law rule sought to be unseated by the statute was harsh only as to public officers *vis-a-vis* public employees, and since the Legislature dealt similarly with both classes, was its intent really so clear as to reach not only a harsh (as to officers) but a beneficent (as to employees) rule of the common law? And to confer the addi-

tional boon of awarding full compensation without mitigation to both classes despite the rule *ex contractu* (as to employees) embracing the existing mitigation concept? Such was adverted to in *Ross, supra*:

The case must be retried upon the unlawful discharge theory * * * as to the measure and mitigation of damages appropriate to that branch of the law of contracts. [90 *N. J. L.* at 528].

These questions may gain perspective by stating the opposing contentions of the parties. The employee relies on the three cases cited above, *McGrath, D'Elia* and *Morrissey,* which hold that the recovery of back salary by a wrongfully discharged municipal employee, by force of the statute, is not subject to deduction by way of mitigation for income earned during that period. He contends — as strongly — that the question of mitigation is a legislative decision and should not be resolved by judicial action. In support of this he cites cases urging the Legislature to enact "compensatory protection," including mitigation, of eventually vindicated public officers and employees, as well as the significance of Governor Meyner's veto in 1956 of proposed revisions in the statute because, *inter alia,* they failed to address the subject of mitigation. *Miele v. McGuire, supra,* 31 *N. J.* at 351; *DeMarco v. Board of Chosen Freeholders, supra,* 21 *N. J.* at 147–48. It must be conceded that in the Supreme Court affirmance of *McGrath, supra,* 38 *N. J.* at 32, the ensuing legislative inaction was emphasized and was thought significant in limiting the judicial function to flat application of the statute. The Court there pointed out:

In reaching its conclusion [in *D'Elia*] the court properly stressed the unequivocal language of the statute and its forceful history. It is worthy of note that, in furtherance of the public interest, Congress and many state legislatures have made suitable provision for mitigation and this Court has repeatedly suggested that legislation dealing comprehensively with the subject should be considered by the New Jersey Legislature. * * * No such legislation has been adopted and the judicial function in the instant matter is but to apply the

pertinent terms of *N. J. S. A.* 40:46–34. [38 *N. J.* at 32 (citations omitted)].

On the other hand, the municipality argues that the rule, that recovery under the statute does not require mitigation, was not really a legislative enactment but a judicial interpretation of the legislative intent, and that as such, it is open to this Court to overrule that interpretation as having been incorrect. The trial and appellate courts below agreed with this argument.[2] Furthermore, the defendant suggests that the interpretation of this statute, as permitting full recovery without mitigation, is incorrect because the statute is in derogation of the common law that no recovery could be had by a wrongfully discharged public officer and, therefore, it must be construed strictly. And that consequently, since the statute is silent on the subject of mitigation, a strict construction of the statute, the municipality contends, requires an interpretation that the statute did not change the general common law rule requiring mitigation of damages.

It is therefore quite clear that in this case the courts below were bound, under the principle of *stare decisis,* by

---

[2] In his trial court opinion, adopted by the Appellate Division, Judge Larner stated:

[I]f the legislature has failed to act in this direction, this court can see no obstacle to change by judicial determination. Such avenue to correction of this inequity [the absence of mitigation] is particularly available, since the denial of mitigation was never expressed by the legislature but was engrafted upon *N. J. S. A.* 40:46–34 by judicial decision commencing with *Ratajczak* [*supra*] and followed by *D'Elia* [*supra*] and its subsequent progeny. Furthermore, mitigation is an accepted doctrine applicable to all actions for damages. A suit for back salary is no more nor less than an action for damages because of unlawful discharge which entitles the plaintiff to a recovery measured by his actual loss; and not by his undiminished salary loss.

Although the Supreme Court has not as yet rejected the holding in *McGrath, supra,* the precedential road is strewn with clues which exhibit a trend in that direction.

formidable precedent. It is not so clear that such precedent should stand. As a first step in resolving that question, if vulnerability in the precedent is thought to exist, and setting aside for the moment the possibility of other construction of the statute *per se* if it does, we consider the general basis and utility of the *stare decisis* principle.

## II.

## *STARE DECISIS*

In *Fox v. Snow*, 6 *N. J.* 12 (1950), a majority of this Court declined to depart from the "long established" case law of this State expressing a testamentary construction holding that a testamentary bequest of a technical fee with a gift over gave rise to an absolute ownership, an estate in fee, with the gift over being void. This decision prompted a dissent by Chief Justice Vanderbilt, both because this rule of construction frustrated the plain intent of a testator and, as importantly, because the majority decision, to him, represented a view of the judicial process which, if consistently followed, would "spell the ultimate ossification and death of the common law" by depriving it of its ability to change. 6 *N. J.* at 14. The Chief Justice went on to say:

> To hold, as the majority opinion implies, that the only way to overcome the unfortunate rule of law that plagues us here is by legislation, is to put the common law in a self-imposed straitjacket. Such a theory, if followed consistently, would inevitably lead to the ultimate codification of all of our law for sheer lack of capacity in the courts to adapt the law to the needs of the living present. The doctrine of *stare decisis* neither renders the courts impotent to correct their past errors nor requires them to adhere blindly to rules that have lost their reason for being. The common law would be sapped of its life blood if *stare decisis* were to become a god instead of a guide. The doctrine when properly applied operates only to control change, not to prevent it. As Mr. Justice Cardozo has put it, "Few rules in our time are so well established that they may not be called upon any day to justify their existence as means adapted to an end. If they do not function they are diseased. If they are diseased, they must not propagate their kind. Sometimes they are cut out and extirpated altogether. Sometimes they are left with the

shadow of continued life, but sterilized, truncated, impotent for harm." *Nature of the Judicial Process* (1921) 98. All lawyers as well as laymen have a perfectly natural longing to think of the law as being as steadfast and immutable as the everlasting hills, but when we face the realities, we must agree with Dean Pound when he says, "Law must be stable, and yet it cannot stand still." *Interpretations of Legal History* (1923) I, and with Professor Williston when he tells us, "Uniform decisions of 300 years on a particular question may, and sometimes have been overthrown in a day, and the single decision at the end of the series may establish a rule of law at variance with all that has gone before." *Some Modern Tendencies in the Law* (1929) 125. The most drastic and far-reaching example of what Professor Williston had in mind was the overturning of the entire *corpus* of federal common law through the overruling of *Swift v. Tyson* [41 *U. S.* 1] 16 *Peters* 1 [10 *L. Ed.* 865] (1842), by *Erie Railroad Co. v. Tompkins*, 304 *U. S.* 64 [58 *S. Ct.* 817, 82 *L. Ed.* 1188] (1938).

✻ ✻ ✻ ✻

✻ ✻ ✻ [I]t would appear that the dangers envisioned from overthrowing this rule are not present here and that the evils resulting from its continuation are great. This being so, should there be hesitation in rejecting this rule merely because it is old? To recognize a rule solely because it has long been the law "would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and the Persians." *Hurtado v. California*, 110 *U. S.* 516, 529 [4 *S. Ct.* 111, 28 *L. Ed.* 232] (1883). We should not permit the dead hand of the past to weigh so heavily upon the law that it perpetuates rules of law without reason. Unless rules of law are created, revised, or rejected as conditions change and as past errors become apparent, the common law will soon become antiquated and ineffective in an age of rapid economic and social change. It will be on its way to the grave. In the instant case the rule applied by the court below should be rejected and effect should be given to the testator's intention that the plaintiff have the bank account in question. [6 *N. J.* at 23–24, 27–28].

However unpersuasive it was to the *Fox* court majority in 1950, this philosophy has clearly guided this Court since, as exemplified in many of its decisions. We have agreed with the Vanderbilt thesis that the process of justice is not bound, as though by some strange sort of Mendelian law, to accept the hereditary transfer of now visible defects in justice, from generation to generation; that no such inevitability is re-

quired by the principle of *stare decisis,* and that the Court, as well as the Legislature, has authority to intervene against operation of any such fallacy.

For instance, *Radio Taxi Service, Inc. v. Lincoln Mut. Ins. Co.,* 31 *N. J.* 299 (1960), and *Bowers v. Camden Fire Ins. Ass'n,* 51 *N. J.* 62 (1968), breathed new life-giving honesty into the bare contractual relationship previously thought to exist between insured and insurer, overruling the precedent unanimously endorsed by our then highest court in *McDonald v. Royal Indem. Ins. Co.,* 109 *N. J. L.* 308 (E. & A. 1932). In *In re Quinlan,* 70 *N. J.* 10, *cert.* den., 429 *U. S.* 922, 97 *S. Ct.* 319, 50 *L. Ed.* 2d 289 (1976), we affirmed a constitutional right of privacy, unrecognized if not denied in earlier precedent. In striking down exclusionary zoning devices in *Southern Burlington Cty. NAACP v. Mount Laurel,* 67 *N. J.* 151, *appeal dismissed,* 423 *U. S.* 808, 96 *S. Ct.* 18, 46 *L. Ed.* 2d 28 (1975), we considered that prior judicial decisions do not prevent a change in judicial view and application where that change is mandated by new conditions. In *State v. Saulnier,* 63 *N. J.* 199 (1973), holding a county court to have jurisdiction over a defendant charged with a non-indictable lesser included offense, we thought a prior judicial decision to the contrary to have no current vitality. Abandoning the concept of interspousal immunity for torts arising out of negligent automobile operation in *Immer v. Risko,* 56 *N. J.* 482 (1970), we reassessed the reason which had prompted adoption of the doctrine in the past, as not supporting its current viability. *See Merenoff v. Merenoff,* 76 *N. J.* 535 (1978).

When the time came to recognize the injustice of sovereign immunity in denying relief to persons injured by the State's negligence, we abandoned that long-established principle in *Willis v. Department of Cons. & Econ. Dev.,* 55 *N. J.* 534 (1970). And when modern conditions prompted reappraisal of the aged *caveat emptor* concept we held, in *Reste Realty Corp. v. Cooper,* 53 *N. J.* 444 (1969), that there was an im-

plied warranty against latent defects in leased premises. In viewing current concepts of what is right and just, we ruled in *Schipper v. Levitt & Sons, Inc.*, 44 *N. J.* 70 (1965), that a builder of new homes may be held liable for design defect therein on warranty or strict liability theories.

Interests of justice required us to hold in *Fernandi v. Strully*, 35 *N. J.* 434 (1961), that a prior contrary decision be disapproved and that the period of limitations on a cause of action, where a foreign object, after surgery, was not removed from plaintiff's body, begins when that victim knew or should have known of the object's presence and the existence of a cause of action therefor. In *Henningsen v. Bloomfield Motors, Inc.*, 32 *N. J.* 358 (1960), we believed that modern conditions mandate that prior established legal principles should not defeat recovery in a case in which we held that the manufacturer of a new automobile impliedly warrants its merchantability to an ultimate purchaser thereof regardless of absence of privity.

Many other instances to the same effect might be cited. This ability of the law to change and develop in the interest of justice extends to a review of statutory interpretations. The general principles which operate in such a case were summarized by Justice Jacobs in *Watson v. United States Rubber Co.*, 24 *N. J.* 598 (1957):

It has been suggested that the principle of *stare decisis* should stay our hand in expressly overruling *Glover*, [*Glover v. Simmons Co.*, 31 *N. J. Super.* 308 (App. Div. 1954)] even though a majority of the court is now firmly convinced that it embodied a mistaken interpretation of the Unemployment Compensation Law. To the extent that the principle of *stare decisis* affords a measure of stability it is of great social value. But as we pointed out in *Arrow Builders Supply Corp. v. Hudson Terrace Apts., Inc.*, 15 *N. J.* 418, 426 (1954), rehearing denied 16 *N. J.* 47 (1954), the principle is not an absolute one and under cogent circumstances it must give way to the overriding force which dictates that, since the purpose of our legal system is to serve justly the needs of present day society, judges must always remain free to re-examine earlier determinations and correct judicial errors whether they be their own or those of their predecessors. Where, as here, a court is called upon to construe a statute, its function is to

seek and carry out the Legislature's purpose as fairly expressed in its language. As the Legislature itself has indicated by its passage of *L*. 1956, *c*. 65, and as we at this time recognize, the decision in *Glover* failed to carry out the legislative purpose, and we know of no sound reason why we should now adhere to its holding. In *Asbury Park Press v. City of Asbury Park*, 19 *N. J*. 183 (1955), this court, in an opinion by Justice Burling, recently overruled the statutory interpretation by the Court of Errors and Appeals in *Whirl-O-Ball, Inc. v. City of Asbury Park*, 136 *N. J. L*. 316 (E. & A. 1947), and other instances involving the discarding of earlier statutory interpretations are collected in the *Arrow Builders* case (15 *N. J*., at *page* 426). See *Stoffer, "The Supreme Court and Stare Decisis,"* 9 *Rutgers L. Rev*. 1 (1954). [24 *N. J*. at 603–04].

■ On the basis of *Watson* and the cases cited and discussed in *Arrow Builders, see* 15 *N. J*. at 426–28, we have no doubt of the Court's power to overrule its previous interpretation of the instant statute. The rule is not otherwise in the federal jurisdiction, in which the United States Supreme Court recently reversed a 17-year standing interpretation of the Civil Rights Act, 42 *U. S. C*. § 1983. In *Monell v. Department of Social Services*, —— *U. S*. ——, 98 *S. Ct*. 2018, 56 *L. Ed*. 2d 611 (1978), the Court partially overruled *Monroe v. Pape*, 365 *U. S*. 167, 81 *S. Ct*. 473, 5 *L. Ed*. 2d 492 (1961). In that opinion, written by Justice Brennan, he mentioned "* * * we have never applied *stare decisis* mechanically to prohibit overruling our earlier decisions determining the meaning of statutes." —— *U. S*. at —— 98 *S. Ct*. at 2038.

Thus free to reconsider our previous holdings, we proceed to the question of whether we should do so, in the context of ascertainable legislative intent in enacting the instant statute.

## III.

### THE STATUTE AS PROPERLY CONSTRUED

■ It goes without saying that the wisdom, good sense, policy and prudence (or otherwise) of a statute are matters within the province of the Legislature and not of the Court.

In *Avant v. Clifford,* 67 *N. J.* 496, 517 (1975), we cited
several decisions to that effect, only recently reemphasized by
us in *Vornado, Inc. v. Hyland,* 77 *N. J.* 347 (1978). We
take this occasion again to foreswear any illusion that this
Court, or any court, "sits as a superlegislature" to determine
the wisdom, need or propriety of statutory law. *Griswold v.
Connecticut,* 381 *U. S.* 479, 482, 85 *S. Ct.* 1678, 1680, 14
*L. Ed.* 510, 513 (1965); *Grand Union Co. v. Sills,* 43 *N. J.*
390, 403 (1964). We repeat as has been said before:

> [C]ourts have confined themselves to measuring executive and legis-
> lative action (as their sworn duty to uphold the Constitution re-
> quires them to do) only on a constitutional and not a politic basis,
> never concerning themselves with the wisdom, justification or even
> the sense or honesty of purpose of the act of the other branch of
> government. That is the business of the other branch. It is the
> Constitution that is the business of the courts. [*Vreeland v. Byrne,*
> 72 *N. J.* 292, 322–23 (1977) (Hughes, C. J., dissenting) (footnote
> omitted)].

It is not to be supposed, then, that in construing
a statute and searching for the legislative intent in enacting
it, in aid of that process of construction, the court injects it-
self into that legislative sphere. Its interpretive role is
quite different, and is a matter of judicial obligation. And
while legislative silence in failing to confirm or overrule or
clarify a statute which has been subjected to a particular
judicial interpretation is significant, it is not conclusive, and
insofar as *McGrath* would consider it so, we overrule it. As
stated in a similar context in *People v. Daniels,* 71 *Cal.* 2d
1119, 80 *Cal. Rptr.* 897, 459 *P.* 2d 225 (Sup. Ct. 1969) (*en
banc*):

> [W]hile the Legislature may thus choose to remain silent, we may
> not. It continues to be our duty to decide each case that comes be-
> fore us; in so doing, we must apply every statute in the case ac-
> cording to our best understanding of the legislative intent; and in
> the absence of further guidance by the Legislature, we should not
> hesitate to reconsider our prior construction of that intent whenever

such a course is dictated by the teachings of time and experience. * * * [T]he rule of deference to legislative judgment applies to the statute "as interpreted by this court." It is this judicial interpretation, and not the wisdom of the statute itself, that is here in issue; and if we conclude we should now revise that interpretation, we have both the power and the duty to do so. * * * Respect for the role of the judiciary in our tripartite system of government demands no less. [71 *Cal.* 2d at 1128, 80 *Cal. Rptr.* at 902, 459 *P.* 2d at 230].

It is true that there is ample precedent in New Jersey to support the proposition that, where a statute has been judicially construed, the failure of the Legislature to subsequently act thereon evidences legislative acquiescence in the construction given the statute. *See, e. g., Lemke v. Bailey,* 41 *N. J.* 295, 301 (1963); *Egan v. Erie R.R. Co.,* 29 *N. J.* 243, 250 (1959); *Caputo v. The Best Foods, Inc.,* 17 *N. J.* 259, 267 (1955); *Miller v. Board of Chosen Freeholders,* 10 *N. J.* 398, 413 (1952). This line of precedent would suggest that the Legislature intended that mitigation not be considered in awarding back pay under the statute.

However, legislative inaction has also been referred to as a "weak reed upon which to lean" and a "poor beacon" to rely on. 2A *Sutherland, Statutory Construction,* § 49.10 at 261 (4th ed. 1973). Accordingly, such inaction may mean nothing more than that the Legislature did not act. *See Donaldson v. North Wildwood Bd. of Educ.,* 65 *N. J.* 236, 240–41 & n. * (1974). As stated in another context by Chief Justice Weintraub in *Schmoll v. Creecy,* 54 *N. J.* 194, 203 (1969): "* * * the question as to the intent of the Legislature that adopted the wrongful death statute is a judicial question as to which neither the action nor inaction of a subsequent Legislature can be dispositive."

Based on this latter view, our Court has recently stated that "[t]he intent expressed in [a statute] is a judicial question with respect to which the inaction of subsequent legislatures is not dispositive." *State v. Sands,* 76 *N. J.* 127, 137–38 n. 1 (1978). This approach has been taken by the California Supreme Court in *People v. Daniels, supra,* which held that, due to the passage of time and the rise of new

ideas, two earlier decisions which dealt with kidnapping should be overruled despite the fact that, subsequent to those decisions, the California Legislature had not seen fit to act on their content. The court said:

Legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval, the weaknesses of which have been exposed elsewhere. But something more than mere silence should be required before that acquiescence is elevated into a species of implied legislation such as to bar the court from reexamining its own premises. "We are not here faced with a situation in which the Legislature has adopted an established judicial interpretation by repeated *reenactment* of a statute." [71 *Cal.* 2d at 1127–28, 80 *Cal. Rptr.* at 901–02, 459 *P.* 2d at 229–30 (quoting from *Muskopf v. Corning Hosp. Dist.*, 55 *Cal.* 2d 211, 218, 11 *Cal. Rptr.* 89, 93, 359 *P.* 2d 457, 461 (Sup. Ct. 1961 (*en banc*) (emphasis in original) (footnote omitted))].

Although *State v. Sands* and *People v. Daniels* support a reevaluation of the legislative intent expressed in *N. J. S. A.* 40A:9–172, the last sentence quoted above from *Daniels* raises the question of whether the enactment of *R. S.* 40: 46–34 (at issue in *McGrath, supra*) into Title 40A in 1971 evidences legislative adoption of *McGrath*. We do not think this is necessarily so because Title 40A represents only a revision and recodification of old Title 40. *N. J. S. A.* 40A: 9–172 is an almost identical repetition of *N. J. S. A.* 40:46–34 and such repetition is present elsewhere in Chapter 9 of Title 40A. We accordingly believe that the enactment of *N. J. S. A.* 40A:9–172 represents no more than a mechanical codification to which little significance should be attached. We are of opinion, then, that the statutory interpretation of *McGrath* is not enshrined by subsequent legislative inaction and that the Court is entirely free to reexamine the validity of that earlier interpretation.

Upon such reexamination we are unable to agree with the absolute nature of *D'Elia's* description of the statutory words as having "such clarity they can have but one meaning," nor indeed with our own Court's view of them in *McGrath,*

*supra,* as "unequivocal language." They certainly could have been more clear and less equivocal if, for instance, the Legislature had specified (as it is still free to do) that the mandated right of recovery of salary was to be "without mitigation ·by other earnings ·derived in the interim period," or words to that effect. Such truly clear and unequivocal language would have settled the issue subject to the constitutional scrutiny suggested by Judge Allcorn's dissent.

We would doubt that the word "salary" as viewed in *McGrath* has a legislative connotation distinguished, say, ·from the Legislature's use of the word "compensation" in *N. J. S. A.* 18A :6–30, dealing with school employees and their right to recover "compensation" when unlawfully dismissed. That statute was held to contemplate mitigation as a factor although it contained no facial reference thereto. *Mullen v. Board of Educ.,* 81 *N. J. Super.* 151 (App. Div. 1963). Similarly, municipal employees in the classified service were held by this Court to be subject to Civil Service statutes, rather than *N. J. S. A.* 40 :46–34 (now *N. J. S. A.* 40A :9– 172), *Telesnick v. Newark,* 63 *N. J.* 221 ,(1973) ; *Mason v. Civil Service Comm'n,* 51 *N. J.* 115 (1968), and therefore subject to the mitigation rule. Judge Larner cited these cases in his opinion below as indicating the beginning attrition of the rule of *McGrath* because of the "inequitable rigors of full salary payment without mitigation" as previously thought to be mandated by the instant statute.

Anent the true intent of the Legislature, unexpressed in plain words, but thought to derive from the use of the word "salary," we have no sure indication, then, that such was intended in a sense other than was "compensation," as otherwise legislated in like context *(N. J. S. A.* 18A:6–30), and as understood and applied in *Mullen, supra,* as we have pointed out. In many respects the words seem synonymous, or nearly so. *Black's Law Dictionary* (rev. 4th ed. 1968) defines "salary" as a reward or recompense for services performed. *Id.* at 1503. "Compensation," by the same token,

is defined in part as follows: "recompense or reward for some * * * service, especially when it is given by statute" and as "[t]he remuneration or wages given to an employee or, especially, to an officer. Salary, pay, or emolument." *Id.* at 354.

And if the terms are not necessarily or precisely synonymous, courts have held them to be equivalent in situations involving the payment of public funds to governmental workers. *See, e.g., Treu v. Kirkwood,* 42 *Cal.* 2d 602, 609, 268 *P.* 2d 482, 486 (Sup. Ct. 1954) (*en banc*) (terms "salary" and "compensation" used in related statutory provisions are synonymous); *Cummings v. Smith,* 368 *Ill.* 94, 99–100, 13 *N. E.* 2d 69, 72 (Sup. Ct. 1937) (words "compensation" and "salary" employed in state constitution are synonymous); *State ex rel. Artmayer v. Board of Trustees,* 43 *Ohio St.* 2d 62, 63–64, 330 *N. E.* 2d 684, 685 (Sup. Ct. 1975) (terms "salary" and "compensation" as used in state constitution are synonymous).

■ A strict construction of a statute in derogation of the common law requires that the legislative intent be clearly and plainly expressed in order to effectuate a change. *E.g., Blackman v. Iles,* 4 *N. J.* 82, 89 (1950). In *Magierowski v. Buckley,* 39 *N. J. Super.* 534, 546 (App. Div. 1956), the court listed four factors to consider in construing such a statute: (1) what was the common law prior to enacting the statute, (2) what was the mischief for which the common law did not provide, (3) what was the remedy intended by the Legislature and (4) what was the purpose of the remedy? The statement in the original printing of the bill which became *L.* 1918, *c.* 139, read:

> This is a bill to protect the employees and officers of municipalities who may be illegally dismissed from their employment. It is now possible under the law to illegally dismiss a man, and when the dismissal is set aside as illegal, it may happen in many instances that the individual cannot recover the salary that is rightfully his because of the law and the decisions in this state. In a word, the Civil Service Law does not give the protection that it ought to give. This bill would remedy that evil and would protect the individual.

What was the "evil" ("mischief," *Magierowski, supra*) referred to, if not the "harsh common law rule" (in New Jersey) foreclosing officers, *vis-a-vis* employees, from any recovery at all for the period of their illegal ouster? And what was the "protection" envisaged by the statute if not that which the common law already gave employees, *vis-a-vis* officers, *Ross, supra?* Can it then be supposed that the Legislature intended the instant statute to embrace part "protection" (compensation) and part "gift" by the municipality of that portion of "salary" above the actual loss as mitigated by outside earnings? Or that it intended the statute to award part "protection" (compensation) and part punitive damages against the municipality, as though a legally deficient or inappropriate dismissal was necessarily wrongful, invidious or tortious and deserving of punishment at the public cost?

There is an important rule of statutory construction adverted to by Judge Goldmann in *Mullen, supra,* to the effect that "the Legislature must always be presumed to favor the public interest as against any private one." 81 *N. J. Super.* at 160. If this be so in fact, can there be assumed a legislative intent to award a gift or "windfall" to the employee, or impose a gratuitous penalty against the employer, *i.e.,* the public?

We answer these questions in the negative with a certain degree of confidence springing, in part, from a recent decision of this Court in *Township of Springfield v. Pedersen,* 73 *N. J.* 1 (1977). There Justice Mountain expressed for a unanimous court a construction of *N. J. S. A.* 40A:14–151, a prototype of the instant statute, applying to municipal police officers. A police officer was dismissed at a time when he was on mandatory sick leave and not receiving his regular salary. Rather, he was being paid disability benefits in lieu of salary under an insurance plan covering members of the police department. Upon his judicial vindication, it was ordered by a court that he receive his full salary, not taking into consideration the in lieu substitution therefor mentioned.

■ ■ This judgment was reversed, for the reasons expressed by Justice Mountain, which we here reaffirm, and which read as follows:

[W]e think that the legislative purpose sought to be achieved by these enactments was to change the harsh rule of the common law which had denied recovery to blameless municipal officials who had been improperly suspended or dismissed from office. We find it hard to believe that the Legislature entertained the further purpose of providing a windfall recovery to such officials to be forthcoming from public funds.

We think the statute means, and should be construed to say, that where a municipal official has been denied compensation because of a suspension or dismissal judicially determined to have been illegal, he will become entitled to receive from the municipality exactly the amount of remuneration \* \* \* as he would have received but for the improper conduct on the part of his employer. We think such an interpretation both fulfills the legislative desire to abrogate the common law rule, in fairness to municipal officials who have been improperly treated, and at the same time gives due concern to the need — often legislatively expressed — to safeguard and protect public funds.

Accordingly, we reverse the judgment of the Appellate Division and remand the case to the trial court to determine what amount of compensation, whether in the form of insurance payments, salary, increases in salary or other employee benefits would have been received by defendant during the period of his improper suspension and dismissal, had such improper act not occurred. [73 *N. J.* at 7].

"In lieu of salary" insurance benefits provided by the municipality are not unlike outside earnings (as here) in at least one respect — they reduce the net loss or damage to the employee, which the statute enacted for his "protection" was manifestly intended to redress.

## IV.

### *CONCLUSION*

■ We believe that the interpretation of the instant statute expressed in *McGrath, D'Elia, Morrissey* and *Ratajczak, supra,* must be overruled; that the "salary" right proclaimed by the statute is subject to mitigation by outside

earnings in the interim by the dismissed and later vindicated officer or employee; that the Appellate Division judgment must be reversed, and the trial judgment for plaintiff vacated.

The case is remanded to the trial court for the ascertainment of damages, if any, in accordance with this opinion; or for the dismissal of the action if that course is indicated in the light of our present construction of the statute.

Reversed.

*For reversal*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For affirmance*—None.