853 A.2d 856

HONORABLE LEONARD LANCE, AS A CITIZEN OF NEW JERSEY AND A TAXPAYER; HONORABLE ALEX DECROCE, AS A CITIZEN OF NEW JERSEY AND A TAXPAYER; HONORABLE JOSEPH M. KYRILLOS, JR., AS A CITIZEN OF NEW JERSEY AND A TAXPAYER; HONORABLE STEVEN M. LONEGAN, AS A CITIZEN OF NEW JERSEY AND A TAXPAYER; HONORABLE BRET SCHUNDLER, AS A CITIZEN OF NEW JERSEY AND A TAXPAYER; AND ROBERT LINDMARK, AS A CITIZEN OF NEW JERSEY AND A TAXPAYER, PLAINTIFFS–APPELLANTS, v. HONORABLE JAMES E. MCGREEVEY, GOVERNOR OF THE STATE OF NEW JERSEY; HONORABLE JOHN E. MCCORMAC, TREASURER OF THE STATE OF NEW JERSEY; AND THE NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY, DEFENDANTS–RESPONDENTS, AND HONORABLE RICHARD J. CODEY, PRESIDENT OF THE NEW JERSEY SENATE; AND HONORABLE ALBIO SIRES, SPEAKER OF THE ASSEMBLY, INTERVENORS–DEFENDANTS–RESPONDENTS.

Argued July 22, 2004—Decided July 26, 2004.

*Mark D. Sheridan, Andrew T. Fede* and *Thaddeus R. Maciag* argued the cause for appellants (*Drinker Biddle & Reath*, attorneys for Honorable Leonard Lance, Honorable Alex DeCroce, Honorable Joseph M. Kyrillos and Robert Lindmark; *Contant Atkins & Fede*, attorneys for Honorable Steven M. Lonegan; and *Maciag & Associates* and *Howes & Howes*, attorneys for Honorable Bret Schundler; *Mr. Sheridan, Mr Fede, Mr. Maciag, Mark D. Villanueva, James K. Webber, Jr., Peter J. Gallagher, Lauren D. Godfrey, W. Timothy Howes* and *Andrew C. White*, on the joint briefs).

*Nancy Kaplen*, Assistant Attorney General, argued the cause for respondents Honorable James E. McGreevey and Honorable John E. McCormac (*Peter C. Harvey*, Attorney General of New Jersey, attorney; *Patrick DeAlmeida*, Deputy Attorney General, on the brief).

*Howard Graff*, a member of the New York bar, argued the cause for respondent New Jersey Economic Development Authori-

ty (*Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein,* attorneys; *Mr. Graff, Charles C. Carella* and *James E. Cecchi,* on the brief).

*Leon J. Sokol* argued the cause for intervenors-respondents (*Sokol, Behot & Fiorenzo,* attorneys; *Mr. Sokol* and *Steven Siegel,* on the brief).

PER CURIAM.

This litigation requires us to determine whether the State properly can rely on borrowed funds to balance its annual budget and fund general expenses, an issue of first impression. It also seeks to revisit a legal debate over the constitutionality of certain bonding mechanisms enacted by the legislative and executive branches without voter approval. *See generally Lonegan v. State,* 174 *N.J.* 435, 809 *A.*2d 91 (2002) (*Lonegan* I) (outlining history of similar challenges). In respect of the first issue, we hold that contract bond proceeds used to fund general expenses in the State budget do not constitute "revenue" for purposes of Article VIII, Section 2, paragraph 2 of the New Jersey Constitution (the Appropriations Clause), and cannot be used to balance the annual budget.

However, because no decision of this Court clearly has set forth the rule of law announced today, and for other reasons expressed below, we apply our holding on a prospective basis. Our decision, therefore, will apply only in connection with next fiscal year's budget and thereafter. As a result, the State properly may proceed with the bond sales as authorized, and no aspect of this decision shall affect either the currently proposed sale or any prior bond authorizations. In view of our disposition, and because we already have addressed whether contract or appropriations debt violates Article VIII, Section 2, paragraph 3 (the Debt Limitation Clause), we need not revisit that issue here. *See Lonegan v. State,* 176 *N.J.* 2, 819 *A.*2d 395 (2003) (*Lonegan* II) ("[O]nly debt that is legally enforceable against the State is subject to the Debt Limitation Clause.").

## I.

We briefly summarize the facts and procedural history, derived largely from the Law Division's decision. The legislative and executive branches adopted an annual budget in the form of an appropriations act, *L.* 2004, *c.* 71 (the Appropriations Act) and related legislation for Fiscal Year 2005, which began on July 1, 2004, and ends on June 30, 2005. Two of the related measures are the Cigarette Tax Securitization Act of 2004, *L.* 2004, *c.* 68 (the Cigarette Tax Act), and the Motor Vehicle Surcharges Securitization Act of 2004, *L.* 2004, *c.* 70 (the Surcharges Act). Those acts make available bond proceeds in excess of $1.9 billion to be appropriated by the Legislature "for any lawful purpose," including the operating expenditures of State government.

Under both statutes, the New Jersey Economic Development Authority (Authority or EDA) is the agency authorized to issue the bonds and deposit the proceeds from their sale into separate funds from which the proceeds will then be transferred to the General Fund at the State Treasurer's request. In the case of the Surcharges Act, the statute authorizes the EDA and the Treasurer to enter into a contract to repay the proposed bond obligations from a fund containing unsafe driving surcharges, subject to appropriation by the Legislature. Similarly, the Cigarette Tax Act authorizes the EDA, consistent with a contract with the Treasurer and subject to legislative appropriation, to repay the proposed bond obligations from a fund generated by dedicated cigarette tax revenues.

More specifically, to secure payment of the bonds, the acts authorize the EDA to pledge the contracts between the Authority and the Treasurer. The statutes explicitly provide, however, that the State is obligated to make payments on the bonds only if the Legislature appropriates monies for that purpose. Each statute denominates the bond proceeds as revenue of the State when transferred to the General Fund. Consistent with that denomination, the Governor has certified the expected bond proceeds as anticipated revenue for purposes of the Appropriations Act. Ab-

sent recognition of the bond proceeds as revenue, the Appropriations Act would show a deficit of approximately $1.5 billion.

Plaintiffs filed suit seeking a declaration that the proceeds of the intended bond sale are not revenue as that term is used in the Appropriations Clause. They further claim that, absent voter approval, the contract or appropriations debt expected to be generated by the Surcharges Act and the Cigarette Tax Act is unconstitutional under the Debt Limitation Clause. The Law Division ruled against plaintiffs on both issues. This Court granted plaintiffs' motion for direct certification, and dismissed as moot plaintiffs' related motion to stay the issuance of any bonds based on the State's representation that it would issue no bonds prior to the date of our anticipated decision.

## II.

As a preliminary matter, the State acknowledges that this Court has never decided the question concerning what constitutes revenue under the Appropriations Clause. (For convenience, we refer to defendants collectively as the State.) At the same time, however, the State argues that the judiciary should decline to address the question because it falls exclusively within the province of the executive branch. The Law Division rejected that argument, as do we. Resolving the present dispute not only is consistent with our constitutional role, but also "is a matter of judicial obligation." *White v. Township of N. Bergen,* 77 *N.J.* 538, 555, 391 *A.*2d 911 (1978).

Turning to the merits of the revenue question, the Appropriations Clause provides:

No money shall be drawn from the State treasury but for appropriations made by law. All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year; except that when a change in the fiscal year is made, necessary provision may be made to effect the transition. No general appropriation law or other law appropriating money for any State purpose shall be enacted if the appropriation contained therein, together with all prior appropriations made for the same fiscal period, shall

exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during such fiscal period, as certified by the Governor.

[*N.J. Const.* art. VIII, § 2, ¶ 2.]

We previously have observed that the Clause reflects a "constitutional command that the State's finances be conducted on the basis of a single fiscal year covered by a single balanced budget." *City of Camden v. Byrne,* 82 *N.J.* 133, 151, 411 *A.*2d 462 (1980). The requirement that the State enact a balanced budget each fiscal year "cannot in any sense be regarded as merely providing governmental housekeeping details, necessary and important but not truly vital." *Id.* at 146, 411 *A.*2d 462 (internal quotation marks and citation omitted). Rather, the Clause "must ... be given full and complete effect in accordance with [its] clear and obvious intent." *Ibid.*

Viewed in that context, the question is whether the constitutional framers would have considered the Appropriations Act, relying as it does on $1.9 billion in borrowed monies to fund general expenses, to be consistent with a "balanced budget." (For purposes of our analysis, general expenses include the ordinary, operating, and day-to-day costs of government.) The short answer is no. We cannot reasonably find that the current Appropriations Act constitutes a balanced budget without defeating the very purpose behind the Appropriations Clause. *See State v. Trump Hotels & Casino Resorts, Inc.,* 160 *N.J.* 505, 527, 734 *A.*2d 1160 (1999) (instructing that, although legislation challenged on constitutional grounds is entitled to presumption of validity, underlying constitutional provision "must be interpreted and applied in a manner that serves to effectuate fully and fairly its overriding purpose") (internal quotation marks and citation omitted).

That purpose is to bar the State from adopting an annual budget in which expenditures exceed revenues. Indeed, the parties do not dispute that a balanced budget does not exceed certified revenues. The dispute is over how to treat bond proceeds that are intended to fund general expenses of State government. Plaintiffs argue that relying on such proceeds belies the

common-sense notion of a balanced budget and is contrary to the framers' original intent in drafting the Appropriations Clause. In response, the State notes that the Clause does not define revenue and that, in the absence of an explicit definition, the authority to define that term rests exclusively with the Governor consistent with his expressed authority to "certify" the amount of revenue available for each year.

We agree with plaintiffs. In a different setting, this Court has observed that "bond proceeds scarcely resemble 'State revenue.'" *Id.* at 536, 734 *A.2d* 1160. At least one other court that has defined the term broadly has done so without including borrowed monies within the meaning of revenue. The Supreme Court of Oregon has explained:

> When we refer to the revenues of the state, we usually mean the annual or periodic yield of taxes, excise, customs, etc., which the state collects and receives into the treasury for public use, but the word "revenues" may be much broader than that as it may include rent, yield, as of land, profit. It includes annual and periodical rent, profits, interest, or issues of any species of property, real or personal, income. [*Pub. Mkt. Co. of Portland v. City of Portland,* 171 *Or.* 522, 130 *P.2d* 624, 644 (1942) (internal quotation marks and citation omitted), *supplemented on reh'g by,* 171 *Or.* 522, 138 *P.2d* 916 (1943).]

We are not persuaded by a dictionary definition put forward by the State describing government revenue as "a broad and general term, including all public monies which the State collects and receives, from whatever source and in whatever manner." *Black's Law Dictionary* 1185 (5th ed.1979). Indeed, that definition begins with prefatory language stating: "As applied to the income of a government," which qualifies the broad language that follows. *Ibid.* Certainly, as plaintiffs point out, income does not obviously include borrowed funds. *See, e.g., ibid.* (defining "public revenues" as "[t]he *income* which a government collects and receives into its treasury" including "[a]nnual or periodical yield of taxes, excise, custom, dues, [and] rents") (emphasis added). We observe also that a dictionary available at the time the Constitution of 1947 was adopted defined revenue to include "[t]he annual or periodical yield of taxes, excise, customs, duties, rents, etc., which a nation, State, or municipality collects and receives into the treasury for

public use; public *income* of whatever kind." *Webster's New International Dictionary* 2132 (2d ed.1934, updated 1945) (emphasis added). Most relevant, the Governor's proposed budget for Fiscal Year 2004–2005 defines revenues similarly in the Reader's Guide Glossary at A–12: "Funds received from taxes, fees or other sources that are treated as income to the state and are used to finance expenditures."

■ We recognize that after revenues are defined, disputes can then arise over the definition of income as that concept appears in the definitions we have reviewed. In such circumstances, we do well to remember Learned Hand's observation that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary." *Cabell v. Markham,* 148 *F.*2d 737, 739 (2d Cir.), *aff'd,* 326 *U.S.* 404, 66 *S.Ct.* 193, 90 *L.Ed.* 165 (1945). We recall, also, this Court's prior teaching that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Vreeland v. Byrne,* 72 *N.J.* 292, 302, 370 *A.*2d 825 (1977) (internal quotation marks and citation omitted). That teaching supports the straightforward notion that borrowed monies, which themselves are a form of expenditure when repaid, are not income (*i.e.,* revenues) and cannot be used for the purpose of funding or balancing any portion of the budget pertaining to general costs without violating the Appropriations Clause.

Nor do we agree with the State's contention that a once-considered constitutional provision, the so-called "Single Fund" paragraph, requires a contrary conclusion. Although that provision contained a broad definition of revenue, it was never adopted. Moreover, even that definition did not specifically include borrowed monies as government revenue. Our rationale parallels that of Justice Stevens, who once remarked in respect of legislation that "the intentions of the proponents of previous legislation which was never enacted are at most a secondary aid to construing the intent of those that enacted a descendent of it." *Kosak v.*

*United States*, 465 *U.S.* 848, 867 n. 5, 104 *S.Ct.* 1519, 1530, 79 *L.Ed.*2d 860, 875 (1984) (Stevens, J., dissenting).

Although our dissenting colleague raises a number of interesting questions, they need not be answered to resolve this dispute. By way of example, questions relating to the applicability of the single object language in the Debt Limitation Clause have not been raised by the parties, and, most important, their disposition is not necessary to resolve this case. We have always adhered to the principle that courts should address only those constitutional provisions that are necessary to dispose of a matter on appeal. *See In Re New Jersey Am. Water Co.*, 169 *N.J.* 181, 197, 777 *A.*2d 46 (2001) (stating that "courts should not reach constitutional questions unless necessary to the disposition of the litigation") (citation omitted).

█ Lastly, barring the bond sales before us would require significant revisions to, if not a complete overhaul of, the current fiscal year's budget. The resulting disruption to the State government could be great. We also are satisfied that the legislative and executive branches acted in good faith, relying on an honest, albeit erroneous, belief that the budget properly was balanced under existing constitutional standards. For those reasons we are convinced that our holding should be given prospective effect only. *See Salorio v. Glaser*, 93 *N.J.* 447, 462–69, 461 *A.*2d 1100 (1983) (discussing practice of applying judicial decisions prospectively in appropriate circumstances). As a result, the State may proceed with the bond sales authorized by the Cigarette Tax Act and the Surcharges Act. Moreover, this decision shall not affect either those or any prior bond authorizations or sales.

## III.

We reverse the judgment of the Law Division except to the extent that our holding is to be applied on a prospective basis only.

Justice LaVECCHIA, concurring in part and dissenting in part.

I concur in the majority's determination that the State be allowed to proceed with the bond sales authorized by the Cigarette Tax Securitization Act of 2004, *L.* 2004, *c.* 68, and the Motor Vehicle Surcharges Securitization Act of 2004, *L.* 2004, *c.* 70, and to use the proceeds of those sales to support expenditures authorized by the Appropriation Act for Fiscal Year 2005. Because I agree that any decision adverse to the State should be prospective only due to the disruption that otherwise would ensue, I join in the disposition of the Court. However, I disagree with the majority's determination that certain contract bond proceeds (*see generally, Lonegan v. State,* 174 *N.J.* 435, 809 *A.2d* 91 (2002) (*Lonegan* I), and *Lonegan v. State,* 176 *N.J.* 2, 819 *A.2d* 395 (2003) (*Lonegan* II)), do not constitute "revenue" under the Appropriations Clause, *N.J. Const.* art. VIII, § 2, ¶ 2, and, as to that, I respectfully dissent. At this point, I am not prepared to say whether the type of borrowing proposed here should be allowed in the future. There are a number of questions that have not been addressed fully and that, I believe, must be considered before a final decision is rendered as to that question. Therefore, I would not issue a decision on the merits now, and instead would require additional briefing and argument.

The majority's opinion recognizes the term "revenue" is shrouded in ambiguity. There are competing dictionary definitions of "revenue." *Black's Law Dictionary* 1319 (6th ed.1990) defines revenue narrowly, as the "yield from taxes, excise, custom, dues, [and] rents," which the majority suggests excludes borrowed funds; but, other editions of *Black's* define revenue as "a broad and general term, including all public monies which the state collects and receives, from what ever source and in whatever manner," *see, e.g., Black's Law Dictionary* 1185 (5th ed.1979), which the State defendants note could encompass borrowed funds. Other dictionary definitions similarly are vague, including those relied upon by the majority, because the "defining" term, "income," is itself ambiguous. *See, e.g., Webster's New International*

*Dictionary* 2132 (2d ed.1934, updated 1945) (defining revenue as "public income of whatever kind").

There are competing definitions to be found in case law as well. The majority points to *Public Market Co. of Portland v. City of Portland,* 171 *Or.* 522, 130 *P.*2d 624, 644 (1942), *supplemented on reh'g by,* 171 *Or.* 522, 138 *P.*2d 916 (1943), for a seemingly narrow definition, but broad definitions are found in other cases, such as *State v. Kemp,* 365 *Mo.* 368, 283 *S.W.*2d 502, 513 (1955) (en banc). In *Kemp,* the Supreme Court of Missouri gave expansive reading to the term "general revenue," stating "[b]y revenue, whether its meaning be measured by the general or the legal lexicographer, is meant the current income of the state from whatsoever source derived which is subject to appropriation for public uses. This current income may be derived from various sources ... but, no matter from what source derived, if required to be paid into the treasury, it becomes revenue or state money." *Ibid.* (internal quotation marks and citation omitted).

Our own case law has determined the word revenue to be ambiguous. In *State v. Trump Hotels & Casino Resorts, Inc.,* we wrestled with the question whether proceeds received by the Casino Reinvestment Development Authority (CRDA) from the sales of its bonds to casino operators constituted "revenues derived" from casino operations under the 1976 casino gambling constitutional amendment, *N.J. Const.* art. IV, § 7, ¶ 2(D). 160 *N.J.* 505, 512, 734 *A.*2d 1160 (1999). If the bond proceeds were so characterized, they would be part of a pool of constitutionally dedicated funds and would not be available to fund the CRDA's redevelopment projects. The majority here correctly notes that in *Trump,* we concluded the proceeds received by the CRDA from borrowings were not revenues derived from gaming, as the term was used in the casino amendment, but interestingly we also concluded that the term included only the proceeds of some, but not all, taxes. *Id.* at 529, 734 *A.*2d 1160. Thus, "revenues derived from" casino operations was determined to refer only to the proceeds of the eight percent gross tax imposed on gaming

operators; it did not include the proceeds of corporate, sales, or other state and local taxes. *Ibid.*

The majority's own construct of its forward-looking rule is a testament to the elusiveness of the term "revenue." In purporting to define the term as it probably was understood by the voters, the majority settles on a definition that excludes borrowed funds from being counted as revenue when the monies are the proceeds of borrowings for general expenses of government. Under the majority's formulation of the rule then, borrowed funds are sometimes revenue for purposes of the Appropriations Clause, sometimes not. Therefore, some borrowed funds may be used to balance a budget, and some may not. It is not clear from the majority's opinion whether voter-approved debt (General Obligation or GO) is on the same footing as contract debt, that is, must voter-approved debt also be subject to the new restrictive definition of revenue? If the two types of obligation are to be treated differently, then one is left to puzzle why the proceeds of one type of lawful obligation constitute revenue but the proceeds of another do not.

The term "revenue" is susceptible to many different meanings. The Legislature and the Governor have determined the term "revenue" should include borrowed funds. It is a reasonable construct. If the term "revenue" as used in the Appropriations Clause does not include the proceeds of borrowings, the money, as the majority seemingly concedes, cannot be spent. That is so because the State can only spend money if it is appropriated by line item or language appropriation, in either a single appropriation act or a series of acts. *City of Camden v. Byrne,* 82 *N.J.* 133, 151, 411 *A.*2d 462 (1980).

In other contexts, when we have addressed ambiguities in constitutional text, we have deferred to the legislature's conclusion where it is reasonable. *See Trump, supra,* 160 *N.J.* at 534, 734 *A.*2d 1160 (stating that, where reasonable, legislative choice in implementing constitutional goal obligates courts "to view tolerantly and with restraint the presumed validity" of legislative

action); *N.J. Ass'n of Correction v. Lan,* 80 *N.J.* 199, 218, 220, 403 A.2d 437 (1979) (acknowledging "broad tolerance" that attaches to legislative action challenged as "constitutional evasion or excess" and observing that when "reasonable men might differ" on issues, including interpretation of constitutional terms, judiciary should defer to "the will of the lawmakers").

In full recognition of the fact that the Court is the ultimate authority on constitutional questions, I would defer nonetheless to the reasonable judgment of the Legislature and Governor here, and include borrowed proceeds as revenue. It is not irrelevant that the term "revenue" has been construed broadly in practice. *See id.* at 213, 403 *A.2d* 437. I do not join in the Court's determination to alter that fiscal practice by now defining revenue restrictively. Indeed, plaintiffs here conceded that the proceeds of GO borrowings constituted revenue. I see no principled reason to treat the proceeds of contract debt differently than GO debt. Both are lawful means of raising monies to be appropriated for government purposes.

I, therefore, disagree with the majority that the proceeds of the borrowings proposed here would not constitute "revenue." That, however, does not end the inquiry. I too believe that the type of borrowing proposed here, if allowed to be repeated, has the potential to harm the public fisc. That said, I would not be comfortable ruling on its constitutionality before several questions could be explored fully. The ultimate question, of course, is whether the State lawfully may borrow to fund day-to-day operating expenses of government. Nothing in the text of the Constitution speaks directly to that point. The Debt Limitation Clause, *N.J. Const.* art. VIII, § 2, ¶ 3, suggests that borrowings will be for only what is traditionally thought of as capital-type expenditures: the State may borrow money only "for some single object or work distinctly specified." That language seems to bespeak the types of investments that are non-recurring and not of an operational character. Yet, if the voter should approve of borrowing for operational type expenditures—and the State correctly informs us

that GO bonds have been authorized for distinctly non-capital projects—why does not that voter approval satisfy any constitutional requirement?

The Debt Limitation Clause, by its terms, does not apply to contract debt because by definition the latter is not a legal obligation of the State. *Lonegan* II, *supra,* 176 *N.J.* at 13–14, 819 *A.*2d 395. Nonetheless, even if the Court should conclude that GO debt can issue to cover operating expenses, does that mean we also must allow the proceeds of contract debt to be so used? There is a ready argument for treating contract debt differently: its merits are not subject to scrutiny by the general electorate. Neither *Lonegan* I or *Lonegan* II specifically addressed the question.

There are related questions as well, such as whether the other restrictions of the Debt Limitation Clause, such as the "single object or work" requirement, should apply to contract bonds. The proposed borrowings before us would seem to have difficulty satisfying the "single object or work" standard.

However, I am not prepared to decide those questions now. In fairness to the parties, the questions have not been fully briefed. Some were first raised by the Court at oral argument. Because I am in agreement with the majority that the two bond acts at issue should be allowed to go forward even if they are constitutionally defective, I would not finally decide this case now. I would require further briefing and argument in respect of whether any debt proceeds—GO or contract debt—should be allowed to be used for operational expenses other than those incidental to a project, whether contract debt should be treated differently than GO debt, and whether the "single object or work" standard should be applied to contract debt. The issues are of great import and deserve our and the parties' full attention before they are decided.

Because I cannot ascribe to the majority's internally inconsistent definition of revenue, I respectfully dissent from that portion of the majority's opinion. I would require further briefing and argument in this case.

*For reversal in part/affirmance in part*—Chief Justice PORITZ and Justices VERNIERO, ZAZZALI and WALLACE—4.

*For concurrence in part/dissent in part*—Justice LaVECCHIA—1.