936 A.2d 971 (2007)
397 N.J. Super. 157
Scott RUMANA, a citizen of Wayne Township in Passaic County, a taxpayer, and Mayor of the Township of Wayne; Ann Mary O'Rourke, a citizen of Wayne Township in Passaic County, a taxpayer, and Township of Wayne Councilperson; Christopher Vergano, a citizen of Wayne Township in Passaic County, a taxpayer, and Township of Wayne Councilperson; Paul Margiotta, a citizen of Wayne Township in Passaic County, a taxpayer, and Township of Wayne Council President; Joseph Schweighardt, a citizen of Wayne, Passaic County, a taxpayer, and Wayne Councilperson; Alan Purcell, a citizen of Wayne, Passaic County, a taxpayer, and Wayne Councilperson and the Township of Wayne, Plaintiffs-Appellants,
v.
COUNTY OF PASSAIC; Passaic County Board of Chosen Freeholders; Passaic County Improvement Authority; Department of Community Affairs, Division of Local Government Services; Department of Community Affairs, Division of Local Government Services, Local Finance Board, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 26, 2007.
Decided December 3, 2007.
*973 Thomas P. Scrivo, Newark, argued the cause for appellants (McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys; Mr. Scrivo, Robert C. Scrivo, Walter R. Krzastek, and Alexandra V. Gallo, on the briefs).
Wayne J. Positan, Roseland, argued the cause for respondents County of Passaic and Passaic County Board of Chosen Freeholders (Lum, Drasco & Positan, attorneys; Mr. Positan, of counsel; Richard A. West, Jr. and Lauren M. Craig, on the briefs).
Peter A. Tucci, Jr. argued the cause for respondent Passaic County Improvement Authority.
Daniel P. Reynolds, Senior Deputy Attorney General, argued the cause for respondents Division of Local Government Services and Local Finance Board (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mr. Reynolds, on the brief).
Before Judges A.A. RODRIGUEZ, C.S. FISHER and C.L. MINIMAN.
The opinion of the court was delivered by
C.L. MINIMAN, J.A.D.
Plaintiffs Scott Rumana, Ann Mary O'Rourke, Christopher Vergano, Paul Margiotta, Joseph Schweighardt, Alan Purcell and the Township of Wayne appeal administrative determinations by defendants Division of Local Government Services (DLGS) and Local Finance Board (LFB), both in the New Jersey Department of Community Affairs. Plaintiffs also raise various claims by way of an action in lieu of prerogative writs against defendants County of Passaic (the County), Passaic County Board of Chosen Freeholders (the Freeholders) and Passaic County Improvement Authority (the PCIA), a public entity authorized to undertake projects to promote recreational uses in Passaic County, all in connection with the proposed sale of the Passaic County Golf Course (Golf Course) to the PCIA.
*974 This action requires us to decide whether the prohibitions of the New Jersey Local Budget Law, N.J.S.A. 40A:4-1 to -88, on deficit financing, N.J.S.A. 40A:4-3, and the New Jersey Local Bond Law, N.J.S.A. 40A:2-1 to -64, on using bond proceeds to finance current expenses, N.J.S.A. 40A:2-3(b), override the provisions of the Local Budget Law, N.J.S.A. 40A:4-1 to -88, permitting counties to recognize proceeds from the sale of county property as miscellaneous revenue, N.J.S.A. 40A:4-27, and the New Jersey County Improvement Authorities Law, N.J.S.A. 40:37A-44 to -135, permitting counties to guarantee bonds issued by county improvement authorities, N.J.S.A. 40:37A-80.
Because we conclude as a matter of law that the Local Budget Law and the Local Bond Law preclude a county from guaranteeing bonds issued by a county improvement authority in connection with the purchase of county property where the county is recognizing the sale proceeds as miscellaneous revenue, we reverse the June 13, 2007, resolution of the LFB approving the County guaranty of the PCIA bonds and the LFB Director's approval of the County 2007 Budget.

I.
The following facts, which are undisputed, provide the context for our analysis. The Golf Course is located in Wayne and the Borough of Totowa. It is presently owned by the County. The Golf Course was developed in the 1930s with additional expansion taking place in the 1950s and 1960s. A portion of the Golf Course was acquired with Green Acres funds.[1] The property consists of approximately 374 acres. The County operates two 18-hole golf courses, known as the "Red Course" and the "Blue Course." These courses encompass approximately 264 acres with the remaining 110 acres available for additions to the golf course or other recreational use.
The Golf Course had been appraised by Zimel Realty Associates in March 2002 as having a market value of $18 million based on its highest and best use as a golf course. The value was determined by comparable sales of five golf courses, only one of which was purchased by a county or municipal entity. The per-acre prices for four of the golf courses ranged from $46,500 to $67,200 but the per-acre price for the golf course purchased by the county or municipal entity was $33,100. The condition of the buildings, tees, fairways, greens and traps at the subject Golf Course was not discussed in the appraisal, although the tennis court was noted to be in poor condition. The appraiser opined that the per-acre value of the Golf Course was $60,000, yielding the above-stated market value.
Early in 2007 the County realized that it was facing a budget shortfall of $33 million for the year. As required by N.J.S.A. 40A:4-5, the County had until January 26, 2007, to introduce a budget. The County missed this deadline and extended the time to February 25, 2007, as permitted by N.J.S.A. 40A:4-19. In the interim, it made use of temporary appropriations under N.J.S.A. 40A:4-20.
In February 2007 the County commissioned Salmon Ventures Limited (Salmon) to conduct a management study of the Golf Course. The Salmon Report, issued on February 20, 2007, indicated that the Golf Course:

*975 is included in the Green Acres Open Space Inventory for Passaic County. Under this program, with a deed restriction, the State and County have agreed that the property cannot be developed and must remain as a public recreational use property. However, under the terms of this restriction, the use of the property as a public golf course, with reasonable fees, is permitted.
The County's request also indicated that the revenue versus expenditure analysis revealed an $847,652 deficit for 2005 and $920,009 for 2006. The Salmon Report author opined:
The Passaic County Golf Course has been operating at a deficit level for several years. What is contained in this report is a short term plan to increase fees and revenues to offset all costs associated with managing the golf course. . . .
There are other issues that need to be addressed at this time. These issues are the improvements that need to [be] completed at the golf course. The new irrigation system that needs to be installed, most of the buildings are in need of major repair and lastly the flooding of several holes that during a heavy rain eliminates nine holes from play. The future, and not so distant future capital improvements that need to be planned, designed, authorized and paid for will be very expensive. In all probability, a $2 to $3 million bond will be necessary to meet those needs. Given the County's extremely sensitive financial and tax situation, this solution is probably not feasible. Other opportunities include getting out of the golf course management business. Two options are to RFP for a management team to run the operation or market the golf course for a potential buyer. Based on prior appraisals that the County requested, the property has an estimated value between $12 million and $18 million.
The Salmon report summarized the following three options: (1) keep management control of the golf course and increase greens fees while reducing the number of full-time employees and improving and upgrading the course; (2) hire a management team to administer the day-to-day operations of the golf course; or (3) market and sell the golf course. According to the Salmon report, the latter option "would produce an influx of several million dollars (between $12 and $18 million) to the County Treasury, the annual expense of nearly $2.6 million to manage the course [would] no longer [be] an issue and there would be a reduction of over 67 full and part-time employees."
Following review of the Salmon Report, the County adopted a resolution on March 22, 2007, authorizing all necessary steps to negotiate and sell the Golf Course to the PCIA. In the resolution, the Freeholders recited that "declining revenues and drastically rising expenses have created a crisis situation that cannot be cured by even the maximum tax increase permitted under the `Cap' provisions of the Local Budget Law." They also recited that massive layoffs would be required even with such maximum tax increase. The Freeholders recognized that only a substantial asset sale would prevent the layoff of 700 to 750 employees. Accordingly, they determined that the County needed to sell the Golf Course. The County then revised its temporary budget on March 27, 2007.
On April 11, 2007, the County submitted an application for the sale of the Golf Course to the PCIA for the sum of $18.5 million. The County also proposed to guarantee the Authority's issuance of bonds totaling $22 million to fund the purchase of the Golf Course and subsequent improvements. Debt service on the bonds *976 in 2008 was projected at almost $1 million and was projected to rise to over $2 million by 2037.
The County revised its temporary budget on April 10, 2007. That same day the County adopted a resolution increasing the greens fees for the Golf Course. The PCIA submitted an application to the LFB on April 18, 2007, seeking review and approval with respect to the proposed financing in connection with the acquisition of the Golf Course. The PCIA proposed to issue bonds not to exceed $22 million in order to fund the acquisition, capital improvements and working capital reserves and pay costs in connection with the issuance of the bonds. The County was to receive $18.5 million of the bond proceeds and would contribute $3 million through its Open Space Fund for capital improvements to the Golf Course. Attached to the application were two proposed PCIA resolutions to be adopted on April 25, 2007, and one County ordinance to guarantee the bonds to be introduced on April 24, 2007.
On April 24, 2007, the County adopted a resolution authorizing County Counsel to file an application with the New Jersey State House Commission for the sale of the Golf Course. On April 25, 2007, the PCIA passed a resolution granting preliminary approval and authorizing the submission of an application to the LFB seeking positive findings with respect to the PCIA's issuance of bonds to fund the purchase of the Golf Course. The PCIA preliminarily approved the purchase and the issuance of $22 million in bonds, $18.5 million to finance the purchase, $1.5 million to be expended for capital improvements to the Golf Course and $1.3 million to be held in a rate stabilization fund.[2] Subsequently, the PCIA passed a resolution granting final approval for the purchase of the Golf Course. The application filed by the PCIA requested that the LFB consent to and approve the proposed County guaranty of payments due on the bonds to be issued. While this application was pending, the County introduced the 2007 Budget on May 9, 2007. This time the budget included a $10 million item reflecting "miscellaneous revenue" stemming from the sale of the Golf Course. The County then submitted its proposed budget to the Director of the Division of Local Government Services (Director) for review and approval.
On June 12, 2007, the New Jersey Department of Environmental Protection approved the County's transfer of the property pursuant to the Green Acres Land Acquisition and Recreational Opportunities Act, N.J.S.A. 13:8A-35 to -55, subject to several requirements, including continued application of Green Acres restrictions and continued use of the property for recreational purposes as required by the deed by which the County acquired title.
Following a public hearing, the LFB granted both requests by issuing positive findings on June 13, 2007. The LFB's resolution relating to the County's guaranty provides, in relevant part, that the LFB had examined the estimates, computations or calculations made in connection with the application. The LFB found:
a) that the County guaranty has been determined by reasonable and acceptable methods;
b) that the County guaranty is not unreasonable nor impracticable, and would not impose an undue and unnecessary financial burden on the local inhabitants within the Authority's jurisdiction or would not materially impair the ability to pay promptly the principal and the interest on the outstanding indebtedness *977 thereof or to provide essential public services to the inhabitants thereof.
The Director certified his approval of the 2007 Budget on July 3, 2007. On the same day, the County adopted the 2007 Budget. Also on the same day, the County adopted Ordinance No.2007-05 (the Guaranty Ordinance) authorizing the guaranty of the proposed Authority bonds to fund the purchase and improvement of the Golf Course.[3]

II.
Plaintiffs, a group of six individuals, including the Mayor and five council members of Wayne, as well as the municipality itself, filed an action in lieu of prerogative writs on August 10, 2007. The complaint, subsequently amended, contained fourteen counts alleging various violations of the New Jersey Constitution and statutes by the named defendants: the County and its Freeholders, the Authority, the Division of Local Government Services and the Board.[4]
All defendants, thereafter, moved to dismiss the complaint. Plaintiffs moved for partial summary judgment and sought a preliminary injunction. Following a telephone conference with the court, the parties entered into a "consent order to maintain the status quo" which provided that the parties agreed to be temporarily restrained from encumbering the Golf Course or issuing bonds to accomplish the sale of the course until the court decided the defendants' motions to dismiss. The consent order was entered on October 13, 2007.
On October 30, 2007, following oral argument, the trial court ordered that the action be transferred to the Appellate Division, finding that Counts 10 and 11 were challenges to final administrative agency actions and fell within the exclusive jurisdiction of the Appellate Division. See R. 2:2-3(a)(2). The trial court also found that the remaining counts, pursuant to the entire controversy doctrine, should be transferred *978 as well. Plaintiffs' application for injunctive relief was denied.
Plaintiffs moved before us on an emergent basis for injunctive relief. On November 1, 2007, we granted temporary restraints.[5] The County moved for reconsideration. On November 5, 2007, we vacated the restraints but accelerated briefing and argument of the appeal and provided that the parties would reargue the question of a stay with respect to the issuance of the bonds. The Supreme Court granted plaintiffs' motion to stay the issuance of bonds and consummation of the contract of sale while this appeal is pending.[6] The County and Authority subsequently filed motions for direct certification and acceleration with the Supreme Court. These motions were denied. The matter is now before us and we proceed to address the merits.

III.
Plaintiffs raise essentially five issues in this action. First, they assert that the Local Bond Law, N.J.S.A. 40A:2-1 to -64, governs the financing for the sale of the Golf Course to the PCIA. Because N.J.S.A. 40A:2-3 precludes the County from incurring indebtedness for financing current expenses or payment of obligations, plaintiffs contend that the County may not use the proceeds from the sale to finance current expenses while at the same time incurring an indebtedness by guaranteeing the bonds to be issued by the PCIA.
More specifically, plaintiffs contend that the Director violated N.J.S.A. 40A:4-76, -77 and -78 when she approved the County's 2007 Budget because the County did not prove that the $10 million miscellaneous revenue would materialize. They assert that without such proof the Director failed to verify the detail and accuracy of the 2007 Budget as required by N.J.S.A. 40A:4-76 and failed to ensure that the County's revenue estimates were "reasonable, accurate and correctly stated" under N.J.S.A. 40A:4-77. As a result, plaintiffs allege that the Director should have refused to approve the County's 2007 Budget pursuant to N.J.S.A. 40A:4-78. Plaintiffs, thus, argue that the Director's action in approving the County's 2007 Budget was arbitrary, capricious and unreasonable.
Plaintiffs also contend that the LFB violated the Local Authorities Fiscal Control Law, N.J.S.A. 40A:5A-1 to -27. Plaintiffs allege that the LFB issued positive findings and recommendations respecting the sale of the Golf Course to the PCIA even though the LFB did not consider all of the factors required by N.J.S.A. 40A:5A-6. This was so because the PCIA application did not contain sufficient information to demonstrate that it would be able to make payments on the bonds as they become due in the future. In fact, they assert that the application proved that the PCIA would not be able to do so.
Second, plaintiffs argue that the 2007 Budget adopted by the County, which anticipated miscellaneous revenue from the sale of the Golf Course, violated N.J.S.A. 40A:4-27 because "the obligation to make such payment [was not] entered into prior to the adoption of the budget."
Third, plaintiffs contend that the County failed to issue a report regarding the reasons for the sale of the Golf Course and its impact as required by N.J.S.A. 40A:12-13.5(a)(1). They assert that such failure would also violate a Green Acres Program regulation, N.J.A.C. 7:36-25.5(b), requiring *979 compliance with N.J.S.A. 40A:12-13.5(a)(1) prior to transfer, rendering the sale "void and of no legal effect." N.J.A.C. 7:36-25.5(c).
Fourth, plaintiffs point out that the County has not yet issued a proposed deed for the transfer of the Golf Course containing the conditions for transfer mandated by N.J.A.C. 7:36-25.5(a)(2), which plaintiffs contend must be submitted for public review. They contend that compliance with these requirements is not obviated by the Garden State Preservation Trust Act, N.J.S.A. 13:8C-1 to -42, because N.J.S.A. 13:8C-34(a)(2) provides that "any restrictions on the lands when they were held by the local government unit are maintained by the new owner." Thus, they assert that compliance with both acts is required.
Finally, plaintiffs argue that the proposed sale of the Golf Course will constitute discriminatory taxation in violation of the Uniformity Clause of the New Jersey Constitution. N.J. Const. art. VIII, § 1, ¶¶ 1, 2. This is so, they contend, because Wayne will no longer receive payments in lieu of taxes from the County and the PCIA is exempt from taxation on its properties under N.J.S.A. 40:37A-85. Additionally, Wayne will be obligated to supply municipal services to the Golf Course that were previously provided by the County, such as police, increasing the burden on Wayne's tax-paying property owners.

IV.
We begin with the issues on appeal over which we have initial review jurisdiction pursuant to R. 2:2-3(a)(2), that is, the final administrative actions of the LFB and the DLGS. First, the State contends that plaintiffs' challenge to the LFB resolutions adopted on June 13, 2007, is untimely. Second, the State urges that plaintiffs have failed to exhaust the administrative remedies available to them under N.J.S.A. 52:27BB-15 as they did not timely seek review by the LFB of the July 3, 2007, determination by the DLGS Director approving the 2007 Budget.

A.
As to review of the two June 13, 2007, LFB resolutions, R. 2:4-1(b) provides that "[a]ppeals from final decisions or actions of state administrative agencies or officers . . . shall be taken within 45 days from the date of service of the decision or notice of the action taken."[7] As such, the LFB argues, a notice of appeal should have been filed on or before July 30, 2007, but this action was not filed until August 10, 2007.
We have been reluctant to impose the time bar of R. 2:4-1(b) where the issues raised involve significant questions of public interest. For example, in Jacobs v. N.J. State Highway Auth., 101 N.J.Super. 572, 576, 245 A.2d 58 (App.Div.1968), we held that an appeal disputing final agency action compelling plaintiff to retire, which was filed sixteen months after the effective date of retirement and well after the forty-five days allowed for appeal, should nonetheless be entertained "because the case concerns a matter of public interest." Although the Supreme Court reversed on other grounds, 54 N.J. 393, 396, 255 A.2d 266 (1969), it too was "of the view that the meritorious issue should be resolved." See also In re Six Month Extension of N.J.A.C. 5:91-1, 372 N.J.Super. 61, 87-88, 855 A.2d 582 (App.Div.2004), certif. denied, 182 N.J. 630, 868 A.2d 1033 (2005); In re Twp. of Warren, 247 N.J.Super. 146, 158, 588 A.2d 1227 (App.Div. *980 1991), rev'd on other grounds, 132 N.J. 1, 622 A.2d 1257 (1993).
Here, the complaint was filed on August 10, 2007, well within the thirty-day time period during which we may extend the time for appeal pursuant to R. 2:4-4(a) even in the absence of a matter of public interest. None of the defendants has articulated any prejudice from the eleven-day delay in filing and plaintiffs have shown good cause for the delay in light of the potential absence of harm from the LFB resolutions until the PCIA acted on the authority to proceed with the transaction. Because the issues before us involve significant matters of public interest that would merit review even beyond that thirty-day period, we conclude that the time to appeal the action of the LFB should be extended to August 10, 2007.

B.
The State contends that we should require exhaustion of administrative remedies. The State urges that plaintiffs' failure to seek LFB review of the DGLS Director's determination precludes our consideration of the merits of this appeal. The State also contends that review after July 13, 2007, has the capacity to wreak havoc with the budgeting process and its impact on property tax rates, making compliance with the statutory time limit on administrative appeals essential.
The rule authorizing appeals from "final decisions or actions of any state administrative agency" provides that an appeal "shall not be maintainable so long as there is available a right of review before any administrative agency or officer, unless the interest of justice requires otherwise." R. 2:2-3(a)(2). Thus, the right to appeal depends upon whether the agency action is a final agency decision and whether an appropriate administrative remedy for resolution of the dispute is available. See N.J. Civil Serv. Ass'n v. State, 88 N.J. 605, 612, 443 A.2d 1070 (1982); Fair Share Housing Ctr., Inc. v. Cherry Hill, 242 N.J.Super. 76, 81, 576 A.2d 24 (App.Div. 1990); Hodgdon v. Project Packaging, Inc., 214 N.J.Super. 352, 359, 519 A.2d 881 (App.Div.1986), certif. denied, 107 N.J. 109, 526 A.2d 180 (1987); Gormley v. Lan, 181 N.J.Super. 7, 10-11, 436 A.2d 535 (App.Div.), aff'd, 88 N.J. 26, 438 A.2d 519 (1981).
Certainly the Director's July 3, 2007, approval of the 2007 Budget was a final agency decision. Furthermore, an administrative remedy was available because N.J.S.A. 52:27BB-15 provides:
A person, including a taxpayer or citizen, aggrieved by a determination made or an order issued by the director may apply to the board for a review and redetermination. Application for review and redetermination shall be filed with the director not more than ten days after the date of the determination or order. Within thirty days after filing of the application the board shall give the applicant an opportunity to be heard, and shall sustain, reverse or modify the determination of the director. The action taken by the board shall be by majority vote, shall be spread upon its minutes and shall be open to inspection as a public record.
Thus, the statute provides for LFB review of the DLGS Director's determinations, including ones made pursuant to the Local Budget Law, N.J.S.A. 40A:4-1 to -88, after which review may be had in the courts. City of Atlantic City v. Laezza, 80 N.J. 255, 263, 403 A.2d 465 (1979).
Generally, we require exhaustion of administrative remedies before we consider the merits of an appeal from agency action. Elon Assocs. v. Twp. of Howell, 370 N.J.Super. 475, 482-84, 851 A.2d 714 (App.Div.), certif. denied, 182 N.J. 149, 862 *981 A.2d 57 (2004); Hovnanian v. N.J. Dept. of Envtl. Prot., 379 N.J.Super. 1, 7-9, 876 A.2d 847 (App.Div.), certif. denied, 185 N.J. 390, 886 A.2d 661 (2005). This requirement, however, may be relaxed.
"[T]he preference for exhaustion of administrative remedies is one `of convenience, not an indispensable pre-condition'" except where the agency has exclusive primary jurisdiction. Abbott v. Burke, 100 N.J. 269, 297, 495 A.2d 376 (1985) (quoting Swede v. City of Clifton, 22 N.J. 303, 315, 125 A.2d 865 (1956)). "It is neither jurisdictional nor absolute." Swede, supra, 22 N.J. at 315, 125 A.2d 865. Where administrative review is available, we must determine whether exhaustion will serve the interests of justice. Abbott, supra, 100 N.J. at 297, 495 A.2d 376.
The exhaustion doctrine seeks to vindicate several essential public policies. The first is to "ensure[ ] that claims will be heard . . . by a body possessing expertise in the area." Laezza, [supra,] 80 N.J. [at] 265, 403 A.2d 465[ ]. Administrative exhaustion also "allows the parties to create a factual record necessary for meaningful appellate review." Ibid. A third interest is discouragement of "piecemeal litigation." Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 559, 401 A.2d 533 (1979). Another policy furthered by the doctrine is eliminating resort to the courts where the agency decision might satisfy the parties and thus moot the factual or legal issue raised. Laezza, [supra,] 80 N.J. at 265, 403 A.2d 465. It is incumbent upon the court to weigh these interests carefully "to find the proper balance." Abbott, [supra,] 100 N.J. at 298, 495 A.2d 376; see also Hinfey v. Matawan Regional Board of Education, 77 N.J. 514, 532, 391 A.2d 899 (1978); K. Davis, 4 Administrative Law Treatise, § 26:1 (1983). The procedural desideratum is the rapid, thorough and impartial determination of all relevant disputed issues. See Abbott, [supra,] 100 N.J. at 297, 495 A.2d 376.
[In re Stoeco Dev., Ltd., 262 N.J.Super. 326, 335-36, 621 A.2d 29 (App.Div.1993).]
We may also relax the exhaustion requirement where the administrative remedies would be futile or illusory. East Cape May Assocs. v. N.J. Dep't of Envtl. Prot., 300 N.J.Super. 325, 339, 693 A.2d 114 (App.Div.1997). Furthermore, where the issue is a question of law and the application of administrative expertise is not required, the interests of justice and expediency negate the requirement of exhaustion. Farmingdale Realty Co. v. Borough of Farmingdale, 55 N.J. 103, 112-13, 259 A.2d 708 (1969) (citing Matawan Borough v. Monmouth County Bd. of Taxation, 51 N.J. 291, 296-97, 240 A.2d 8 (1968)).
We must determine whether exhaustion of administrative remedies in this case is required. The only agency action subject to the exhaustion requirement is the DLGS Director's July 3, 2007, approval of the 2007 Budget. One of the issues raised with respect to that action is the inclusion of the sale proceeds as miscellaneous revenue where the County's guaranty of the PCIA bonds results in increased, albeit contingent, indebtedness. By the time of that approval, the LFB had already adopted resolutions approving the sale of the Golf Course and the County's guaranty of the PCIA bonds and, thus, the LFB has already considered the core issue we address here. Laezza, supra, 80 N.J. at 265, 403 A.2d 465. Those earlier resolutions certainly suggest that the LFB's review of the Director's decision would not likely satisfy plaintiffs. Ibid. Indeed, the position adopted by the LFB before us is that the LFB's resolutions and the Director's approval of the budget are supported by substantial evidence and are legally correct. We also note that the *982 LFB has no jurisdiction over some of the issues raised by plaintiffs that surround the core legal issue before us. All of the issues may be determined by us, promoting "rapid, thorough, complete and impartial determination." Abbott, supra, 100 N.J. at 297, 495 A.2d 376. This consideration is particularly important because the County was required by N.J.S.A. 40A:4-5 to introduce and approve its budget by January 26, 2007, and the calendar year is drawing to a close.[8] These considerations outweigh the interests of the defendants in securing review of the 2007 Budget by the LFB prior to appellate review. Id. at 298, 495 A.2d 376. As a consequence, we conclude that appellate review of the DLGS Director's approval of the 2007 Budget should be available without exhaustion of administrative remedies.

V.

A.
The scope of our review is well established and is restricted to the following four inquiries:
(1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[George Harms Const. Co. v. N.J. Turnpike Auth., 137 N.J. 8, 27, 644 A.2d 76 (1994).]
Accordingly, "[o]ur function is to determine whether the administrative action was arbitrary, capricious or unreasonable." Burris v. Police Dep't, W. Orange, 338 N.J.Super. 493, 496, 769 A.2d 1112 (App.Div.2001) (citing Henry v. Rahway State Prison, 81 N.J. 571, 580, 410 A.2d 686 (1980)). The precise issue is whether the findings of the agency could have been reached on the credible evidence in the record, considering the proofs as a whole. Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965).
The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the person challenging the administrative action. McGowan v. N.J. State Parole Bd., 347 N.J.Super. 544, 563, 790 A.2d 974 (App. Div.2002) (citing Barone v. Dep't of Human Servs., Div. of Med. Asst., 210 N.J.Super. 276, 285, 509 A.2d 786 (App. Div.1986), aff'd, 107 N.J. 355, 526 A.2d 1055 (1987)).
The [DGLS] Director's decision carries with it a presumption of reasonableness and validity. One challenging it bears the burden of demonstrating that the decision was arbitrary, unreasonable and capricious. Moreover, in reviewing the administrative decision, the standard of judicial review is whether there is sufficient support in the record for the decision. Also, recognition must be given to the expertise of the Director and the Board in local government budgetary affairs.

*983 [County of Morris v. Skokowski, 86 N.J. 419, 424, 432 A.2d 31 (1981) (citations omitted).]
"It is settled that `[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J.Super. 52, 56, 766 A.2d 312 (App.Div.2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J.Super. 93, 102, 704 A.2d 562 (App. Div.1997)). "Absent arbitrary, unreasonable or capricious action, the agency's determination must be affirmed." Ibid. (citing R & R Mktg., L.L.C. v. Brown-Forman Corp., 158 N.J. 170, 175, 729 A.2d 1 (1999)).
"Generally, the wisdom, prudence and good sense of the Legislature in the enactment of law are not questions for the judiciary to resolve." Id. at 57, 766 A.2d 312 (citing Burton v. Sills, 53 N.J. 86, 95, 248 A.2d 521 (1968)); see also Burt v. W. Jersey Health Sys., 339 N.J.Super. 296, 309, 771 A.2d 683 (App.Div.2001). "Although we recognize that deference is generally given to an administrative agency charged with interpretation of the law, we are not bound by the agency's legal opinions." Levine v. State of N.J., Dep't of Transp., 338 N.J.Super. 28, 32, 768 A.2d 192 (App.Div.2001) (citing G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 170, 723 A.2d 612 (1999)).

B.
The issue before us is one of law. We must determine whether the form of transaction at issue here is permitted by the Local Budget Law and the Local Bond Law.
A county is certainly authorized by the County Improvement Authorities Law to sell property to an improvement authority. N.J.S.A. 40:37A-77 provides in pertinent part:
Any county by resolution of its governing body . . . is hereby empowered, without any referendum or public or competitive bidding, to sell . . . to an authority . . . any real . . . property which may be necessary or useful and convenient for the purposes of the authority and accepted by the authority. Any such sale . . . may be made or given with or without consideration and for a specified or an unlimited period of time and under any agreement and on any terms and conditions which may be approved by such county . . . and which may be agreed to by the authority in conformity with its contracts with the holders of any bonds.
Thus, the sale of the Golf Course, standing alone, is permitted by the County Improvement Authorities Law.
Furthermore, a county is generally empowered by the County Improvement Authorities Law to guarantee the bonds of an improvement authority. The particular statutory provision reads in pertinent part as follows:
For the purpose of aiding an authority in the planning, undertaking, acquisition, construction, financing or operation of any facility which the authority is authorized to undertake . . ., the county . . . may, pursuant to resolution duly adopted by its governing body . . . in the manner provided for adoption of a bond ordinance as provided in the local bond law and with or without consideration and upon such terms and conditions as may be agreed to by and between the county . . . and the authority, unconditionally guarantee the punctual payment of the principal of and interest on any bonds of the authority.
[N.J.S.A. 40:37A-80.]
*984 When a county guarantees an improvement authority's bonds, it becomes "obligated to pay the principal of and interest on said bonds in the same manner and to the same extent as in the case of bonds issued by it." Ibid. Furthermore, the statute provides that "the principal amount of bonds so guaranteed, shall, after their issuance, be included in the gross debt of such county . . . for the purpose of determining the indebtedness of such county or municipality under or pursuant to the local bond law." Ibid. Consequently, the guaranty of the PCIA bonds, again standing alone, was authorized by this law.
Finally, it is clear that a county is generally permitted by the Local Budget Law to treat the proceeds from the sale of property as miscellaneous revenue in its budget. N.J.S.A. 40A:4-27 provides as follows:
A local unit may anticipate as a miscellaneous revenue the total amount of all payments due and payable to the local unit during the fiscal year, directly or indirectly as a result of the sale of property by the local unit, when the obligation to make such payment is entered into prior to the adoption of the budget.
As a result, the item for miscellaneous revenue in the 2007 Budget, standing alone, was permitted by the Local Budget Law.
It is the cash-basis requirement of the Local Budget Law, N.J.S.A. 40A:4-3, and the Local Bond Law prohibition from engaging in deficit financing, N.J.S.A. 40A:2-3, that infuse our review of the entire transaction before us, rather than its component parts. The Local Budget Law provides that "[t]he budget of each local unit shall be prepared on a cash basis unless otherwise permitted by law." N.J.S.A. 40A:4-3. The Local Bond Law provides that:
Any local unit, by bond ordinance, may incur indebtedness, borrow money, authorize and issue negotiable obligations for financing:
. . . .
b. any purpose for which it is authorized or required by law to make an appropriation, except current expenses, as may be defined by rule and regulation of the Local Finance Board, and payment of obligations (other than those for temporary financing) . . .
. . . .
No local unit shall borrow money or issue its obligations for purposes authorized under this chapter except as provided in this chapter.
[N.J.S.A. 40A:2-3 (emphasis added).]
Clearly, the County is barred by these provisions from directly borrowing money to cover its budget gap, yet the net effect of the transaction before us is that the County incurred gross debt in the face amount of $22 million to fund $10 million in miscellaneous revenue specifically to close its budget gap. Indeed, the March 22, 2007, resolution makes it clear that the reason the County decided to sell the Golf Course was because the County did not believe that the maximum amount of tax revenue it could impose under the 2.4% "cap" provision of N.J.S.A. 40A:4-45.4 would cover its expenses. We will not honor form over substance, Suburban Disposal, Inc. v. Twp. of Fairfield, 383 N.J.Super. 484, 496, 892 A.2d 720 (App. Div.2006). As a consequence, we are satisfied that the County was not permitted by N.J.S.A. 40A:2-3 and 40A:4-3 to recognize the proceeds from the sale of the Golf Course as miscellaneous revenue while at the same time incurring indebtedness by guaranteeing PCIA's bonds.
It would appear at first blush that N.J.S.A. 40A:2-3 and N.J.S.A. 40A:4-3 *985 might conflict with various provisions of the County Improvement Authorities Law and the portion of the Local Budget Law that permits inclusion of the property sale proceeds in miscellaneous revenue. In resolving a conflict among statutory provisions, we are guided by principles of statutory construction. "One such canon of construction is ejusdem generis, meaning, `when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words.'" Stryker Corp. v. Dir., Div. of Taxation, 168 N.J. 138, 155-56, 773 A.2d 674 (2001) (quoting State v. Hoffman, 149 N.J. 564, 584, 695 A.2d 236 (1997)); see also Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 367, 924 A.2d 447 (2007) (citing 2A Norman J. Singer, Sutherland Statutory Construction § 47:17 (6th ed.2000)); Wiese v. Dedhia, 188 N.J. 587, 593, 911 A.2d 479 (2006); Clymer v. Summit Bancorp, 171 N.J. 57, 69-70, 792 A.2d 396 (2002); N.J. Transit Corp. v. Borough of Somerville, 139 N.J. 582, 591, 661 A.2d 778 (1995) ("It is a well established precept of statutory construction that when two statutes conflict, the more specific controls over the more general."); Wilson v. Unsatisfied Claim and Judgment Fund Bd., 109 N.J. 271, 278, 536 A.2d 752 (1988); Kingsley v. Wes Outdoor Adver. Co., 55 N.J. 336, 339, 262 A.2d 193 (1970).
Under this rule, when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words. This technique saves the legislature from spelling out in advance every contingency in which the statute could apply.
[Hovbilt, Inc. v. Twp. of Howell, 263 N.J.Super. 567, 571, 623 A.2d 770 (App. Div.1993) (citations omitted), aff'd, 138 N.J. 598, 651 A.2d 77 (1994).]
It is apparent that N.J.S.A. 40A:2-3 and N.J.S.A. 40A:4-3 are both very specific statutes. The former flatly prohibits borrowing money to pay current expenses and the latter demands that all local budgets be prepared on a cash basis. They are the starting points for local budgets. The overriding purposes of the Local Budget Law are to promote sound business practices by counties and municipalities and prevent deficit financing.
The Local Budget Law regulates the budget-making process for all counties and municipalities in the State. It establishes the procedure to be followed in adopting local budgets, N.J.S.A. 40A:4-4 to 10, as well as the form and content thereof, N.J.S.A. 40A:4-21 to 45. All budgets must be prepared on a cash basis unless otherwise permitted by law. N.J.S.A. 40A:4-3. This insures that local governments will pay for the expenses they incur with cash actually collected or received during the fiscal year. The purpose of the Law is to require local governments to follow sound business principles in their budgetary practices. Its aim is to insure that anticipated revenues equal expenditures, State v. Boncelet, 107 N.J.Super. 444, 450-451, 258 A.2d 894 (App.Div.1969), and to prohibit deficit financing. Mount Laurel Township v. Local Finance Board, 166 N.J.Super. 254, 257, 399 A.2d 982 (App. Div.1978), aff'd, 79 N.J. 397, 399 A.2d 980 (1979).
[Skokowski, supra, 86 N.J. at 422-23, 432 A.2d 31.]
See also, City of Atlantic City v. Cynwyd Invs., 148 N.J. 55, 66, 689 A.2d 712 (1997) (The aim of the Local Budget Law is "to insure that anticipated revenues equal expenditures . . . and to prohibit deficit financing.").
*986 In the context of the State's budget, our Supreme Court has determined that bond proceeds may not be used to balance the State budget. Lance v. McGreevey, 180 N.J. 590, 596-97, 853 A.2d 856 (2004). There, the New Jersey Economic Development Authority issued bonds in the amount of $1.9 billion and deposited the proceeds from their sale into separate funds which were then transferred to the General Fund. Id. at 594, 853 A.2d 856. The funds were then treated as revenue, without which the Appropriations Act, L. 2004, c. 71, would show a deficit of $1.5 billion. Id. at 594-95, 853 A.2d 856. The Court concluded under the Balanced Budget Amendment, N.J. Const. art. VIII, § 23, ¶ 2, that bond proceeds were "borrowed monies, which themselves are a form of expenditure when repaid, [and] are not income (i.e., revenues) and cannot be used for the purpose of funding or balancing any portion of the budget pertaining to general costs." Id. at 598, 853 A.2d 856. This determination is consistent with a prior decision in which the Court observed that "bond proceeds scarcely resemble `State revenue.'" State v. Trump Hotels & Casino Resorts, Inc., 160 N.J. 505, 527, 536, 734 A.2d 1160 (1999) (a constitutional provision "must be interpreted and applied in a manner `that serves to effectuate fully and fairly its overriding purpose'") (quoting Dickinson v. Fund for Support of Free Pub. Sch., 95 N.J. 65, 95, 469 A.2d 1 (1983)).
The overriding purpose of the Local Budget Law is to promote sound business practices and prevent deficit financing. It precludes recognition of the sale proceeds from the Golf Course as miscellaneous revenue when those proceeds are irrevocably tied to indebtedness incurred by the County. It also precludes the guaranty of the PCIA bonds because that guaranty was given to secure sufficient miscellaneous revenue to balance the 2007 Budget.
We recognize that the County Improvement Authorities Law provides that "[a]ny such guaranty of bonds of an authority may be made, and any resolution authorizing such guaranty may be adopted, notwithstanding any statutory debt or other limitations, including particularly any limitation or requirement under or pursuant to the local bond law." N.J.S.A. 40:37A-80. However, the current-expense exception set forth in N.J.S.A. 40A:2-3(b) of the Local Bond Law is not a "limitation or requirement" but an absolute prohibition. Thus, N.J.S.A. 40:37A-80 does not compel a different conclusion.
The sale of the Golf Course to the PCIA was clearly not an arm's-length transaction. The PCIA accepted the County's offer without negotiating the sale price. The record certainly suggests that the price should have been negotiated. The five-year-old appraisal indicated a value of $18 million, but the $33,100 per-acre price paid for the only golf course considered as a comparable sale that was acquired by a county or municipal entity suggests that the value of the Golf Course was around $12 million. Indeed, the Salmon Report gave a range of $12 million to $18 million, although that seems to have been predicated on the 2002 appraisal. In any event, it is clear from the Salmon Report that "[o]verall, the physical appearance of the Golf Course shows a lack of attention to property maintenance" and that the Golf Course was in need of repairs and maintenance as well as $2 million to $3 million in capital improvements. Additionally, the Golf Course had annual expenditures that exceeded revenues by almost $1 million in 2006. Any buyer in an arm's-length transaction would certainly have considered the 2002 appraisal in combination with the Salmon Report and at least negotiated the price. Instead, the PCIA simply agreed without negotiation to pay $18.5 million and to secure an additional *987 $3.5 million in bond proceeds to effect repairs and maintenance and make capital improvements. The absence of an arm's-length transaction supports our conclusion that the dominant purpose of the Golf Course sale was to secure bond proceeds sufficient to cover the County's 2007 budget gap and create a surplus for 2008.
Another factor that supports the conclusion that this transaction runs afoul of N.J.S.A. 40A:2-3 and 40A:4-3 is the undisputed fact that the County will be called upon to pay on the bonds. In 2006 the Golf Course generated $1.6 million in revenue and had $2.5 million in expenses. The bonds will impose an additional $1 million in annual debt service that will rise to over $2 million per year by the date the bonds will become due. Plaintiffs have made a substantial showing, based on the proofs submitted by the County, the Freeholders and the PCIA, that the County will have to pay at least $18 million of the over $50 million in total debt service on the County's guaranty of the bonds; the County has not rebutted this financial calculation. This transaction is no more than a thinly disguised attempt to circumvent the Local Budget Law and the Local Bond Law, as well as the Local Government Cap Law limitations on tax levies because repayment of debt service is an express exception to the cap against which the County was struggling. N.J.S.A. 40A:4-45.3(d). As a result, we conclude that the County may not guarantee the PCIA bonds and retroactively vacate the LFB approval of that guaranty.

VI.
In addition to vacating the guaranty, we also reverse the Director's approval of the 2007 Budget. N.J.S.A. 40A:4-27 only permits recognition of property sale proceeds as miscellaneous revenue "when the obligation to make such payment is entered into prior to the adoption of the budget." The budget here was adopted on July 3, 2007, and the sale contract was executed on October 10, 2007. The County's argument that the statute is "permissive clarification, not limitation" has no support in our case law or in the statute. That construction would make the statute requirement superfluous. We may not interpret statutes in that fashion. Franklin Tower One, L.L.C. v. N.M., 157 N.J. 602, 613, 725 A.2d 1104 (1999). Accordingly, after all contingencies in the sale contract have been satisfied, the County must submit an amended budget to the DLGS Director in accordance with N.J.S.A. 40A:4-9.
We need not consider the balance of plaintiffs' claims in light of our ruling vacating the guaranty and requiring an amended budget. We merely note that the claim of discriminatory taxation is premature because the PCIA is authorized to make payments in lieu of taxes under N.J.S.A. 40:37A-83 and has not yet acquired title to the Golf Course.
Reversed.
NOTES
[1] Green Acres Land Acquisition and Recreational Opportunities Act, N.J.S.A. 13:8A-35 to -55.
[2] There is no explanation for the remaining $700,000.
[3] For procedural reasons, a second guaranty ordinance No.2007-16 was published, and adopted on October 9, 2007.
[4] Count 1 sought a judgment declaring that the $10 million of Miscellaneous Revenue in the 2007 Budget is an "impermissible bonding of current expenses."

Count 2 alleged that the Authority's acquisition of the Golf Course would violate N.J.S.A. 40:37A-54 because it is not an authorized project.
Count 3 sought a declaration that the Guaranty Ordinance violated N.J.S.A. 40A:2-3.
Count 4 alleged a violation of the Open Public Meetings Act. This count was dismissed and that decision has not been appealed.
Count 5 alleged a violation of the Local Lands and Building Laws, N.J.S.A. 40A:12-1 to -30.
Count 6 and 7 alleged violations of the Administrative Transfer of Funded or Unfunded Parkland, N.J.A.C. 7:36-25.5
Count 8 alleged a violation of the County Improvement Authorities Law, N.J.S.A. 40:37A-1 to -135.
Count 9 alleged a violation of N.J.S.A. 40A:4-27, a section of the Local Budget Law that regulates Miscellaneous Revenues.
Count 10 alleged that the Director's approval of the 2007 Budget violated the Local Budget Law.
Count 11 alleged a violation of the Local Authorities Fiscal Control Law, N.J.S.A. 40A:5A-1 to -27 by the Board when it approved the Authority's application for financing the purchase of the Golf Course.
Count 12 alleged that the Authority acted arbitrarily, capriciously and unreasonably in authorizing the purchase of the Golf Course.
Count 13 alleged that the County acted arbitrarily, capriciously and unreasonably in adopting the 2007 Budget and the Guaranty Ordinance.
Count 14 alleged that the County and Authority violated the Uniformity Clause of the New Jersey Constitution, art. VII, § 1, ¶ 1(a) and N.J.S.A. 54:4-2.25.
[5] Rumana, et al v. County of Passaic, et al. (App.Div. November 1, 2007) reconsidered and vacated (App.Div. November 5, 2007).
[6] Rumana, et al. v. County of Passaic, et al. (November 13, 2007).
[7] For the purpose of this appeal, we shall assume that the resolutions were served on June 13, 2007, or that notice of the action taken by the LFB was given on that day.
[8] Contrary to the arguments of the County and the PCIA, the fact that we are now considering these contentions at such a late date cannot be entirely laid at plaintiffs' doorstep. The record reveals that the County failed to introduce its budget by January 26, 2007, as required by N.J.S.A. 40A:4-5, and adopted several emergency temporary budgets while it pursued the sale of the Golf Course that led to the various steps that we consider in this appeal.