33 A.3d 519

# IN THE MATTER OF DANIEL RODRIGUEZ.

# IN THE MATTER OF DOUGLAS TUBBY.

Superior Court of New Jersey
Appellate Division

Argued October 24, 2011—Decided December 20, 2011.

442

Before Judges PARRILLO, GRALL and SKILLMAN [1].

*Donald C. Barbati* argued the cause for appellants Daniel Rodriguez and Douglas Tubby (*Pellettieri, Rabstein & Altman*, attorneys; *Frank M. Crivelli* and *Mr. Barbati*, on the brief).

*Mary Beth Wood*, Senior Deputy Attorney General, argued the cause for respondent Department of Law and Public Safety (*Paula T. Dow*, Attorney General, attorney; *Lewis A. Scheindlin*, Assistant Attorney General, of counsel; *Ms. Wood*, on the brief).

The opinion of the court was delivered by

[1] Judge Skillman did not participate in oral argument. However, the parties consented to his participation in the decision. *R.* 2:13-2(b).

GRALL, J.A.D.

Douglas Tubby and Daniel Rodriguez are corrections officers employed by the Department of Corrections (DOC), and they are among the defendants in a civil action filed by an inmate. The inmate, Eduardo McLaughlin, alleges violations of the Civil Rights Act, *N.J.S.A.* 10:6–1 to 6–2, and the Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3.[2] Tubby and Rodriguez appeal from the Attorney General's decisions denying them legal representation in McLaughlin's civil action pursuant to *N.J.S.A.* 59:10A–1 to –2. Because the underlying facts and legal issues are the same, we consolidate the appeals. We reverse the denials, because they lack adequate support in the record as a whole and do not address the controlling legal principles. *Prado v. State,* 186 *N.J.* 413, 427, 895 *A.*2d 1154 (2006).

I

The incident that is the subject of McLaughlin's civil claims against Tubby, Rodriguez and the other corrections officers occurred on May 14, 2008. As a consequence of the encounter, McLaughlin was admitted to the infirmary and treated for multiple injuries that included three wounds on the back of his head which had to be sutured, abrasions on his right arm and back, bruises on his upper torso and a closed head injury.

The trouble started when the alarm on a metal detector sounded as McLaughlin passed through on his way to another area of the correctional facility. As directed, he walked through the detector again; this time he did not set off the alarm. Nevertheless, McLaughlin was frisked. By his account, his pants were pulled up above his knees, and when he questioned the necessity for the roughness, the officer grabbed his testicles. McLaughlin

---

[2] These are the charges against Rodriguez and Tubby in McLaughlin's amended complaint filed on November 12, 2010. The Attorney General's decisions discuss McLaughlin's initial complaint filed on May 13, 2010, which apparently included federal and state law claims.

claims that in response to his objection to the touching, another officer called him a name and said McLaughlin would have enjoyed the contact if he were on the street. McLaughlin remarked that the offensive moniker better fit the officer who grabbed him.

After McLaughlin left the area of the metal detector, officers followed him through the doors and directed him to stop and submit to a second frisk in the hallway beyond. That hallway is out of the range of the security camera that captured the first frisk. There, McLaughlin faced the wall and placed his hands on the wall above his head. According to him, during the frisk one of the officers choked him, which led him to turn away from the wall. He was then hit on the head twice and fell to the ground where an officer he named, not Rodriguez or Tubby, kicked him in the head and other unnamed officers struck him with "sticks" on the right side of his body.

According to the officers who provided information about the second frisk and the struggle that followed, McLaughlin was hostile, took his hands from the wall, made a fist and violent and threatening gestures, and resisted efforts to restrain him. One of them admitted that batons were "flying" in response.

Tubby and Rodriguez admitted using their batons. Tubby was present from the time that McLaughlin first passed through the metal detector. He explained that when he saw McLaughlin take his hands off the wall during the second frisk, he turned to tell another officer to call a code. When he looked back, McLaughlin and the other officers were on the floor; accordingly, he joined the group and struck McLaughlin with his baton three or four times in the area of his thighs while McLaughlin was on the floor. Rodriguez arrived as the second frisk was ordered. He saw McLaughlin try to grab another officer, and he admits to hitting McLaughlin once in the leg with his baton before McLaughlin fell to the floor.

The accounts given by the various officers were not entirely consistent, but it is fair to say that someone crediting the versions least favorable to Tubby and Rodriguez could conclude that they

each hit McLaughlin on the head with a baton before he was taken to the floor. Specifically, one officer asserts that he was hit in the hand with a baton and that batons came over his shoulders from positions where he had seen Tubby and Rodriguez.

Following the incident, the DOC took action against McLaughlin and several corrections officers, including Tubby and Rodriguez. An investigator from the DOC's special investigation division (SID) prepared a report, from which the facts stated above are drawn. The DOC also reported the incident to the Mercer County Prosecutor, but the Prosecutor did not bring any charges. In addition, the DOC filed disciplinary charges against McLaughlin, which are mentioned in the SID report, and against Tubby and Rodriguez.

The SID investigator concluded that there were about seven officers in the "immediate vicinity" of the second frisk, that using a baton to strike a head is a use of deadly force and that there was no justification for the use of that force. Considering the various conflicting accounts of the officers, the SID investigator also concluded that Tubby and Rodriguez could not have struck McLaughlin below his waist because other officers would have been in the way.

McLaughlin was charged with committing a prohibited act— attempted assault, *.803/*.002—in violation of *N.J.A.C.* 10A:4–4.1. He was found guilty of *.306, conduct disruptive of the orderly operation of the facility, on the determination that the evidence did not establish attempted assault but did establish disruption. McLaughlin filed an appeal with this court.

While McLaughlin's appeal was still pending in this court, McLaughlin filed his civil action on May 13, 2010. Subsequently, we affirmed the DOC's determination on the ground that it was supported by sufficient credible evidence in the record. *McLaughlin v. N.J. Dept. of Correc.,* No. A–5553–07, 2010 *WL* 4117169 (App.Div. June 7, 2010) (slip op. at 7). The opinion includes the following summary of the DOC's findings: "[A]s [the officer] was beginning the search, [McLaughlin] 'turned around in

an aggressive manner causing the attending staff to restrain the inmate,' " and the officers " 'believe[d] that an assault by the inmate was imminent and the inmate had to be restrained' and that '[t]he inmate's actions ... placed the staff and the inmate's safety in jeopardy.' " *Id.* at 4–5.

One week after this court's opinion was filed, on June 14, 2010, officers Tubby and Rodriguez requested representation from the Attorney General in McLaughlin's civil action. At that time the officers' administrative appeals from the discipline they received for their role in the McLaughlin incident—120 days' suspension for "inappropriate physical conduct or mistreatment"—were still pending before the DOC. But on July 2, 2010, the DOC dismissed the charges.

Four-and-one-half months later, on November 16, 2010, the Attorney General's designee completed letter decisions setting forth reasons for denying Tubby and Rodriguez representation in McLaughlin's civil action. In denying representation, the Attorney General relied exclusively on: the officers' June 14 requests for representation; the initial civil complaint filed by McLaughlin; the report of SID's investigator dated October 10, 2008; and the work history of the officers as of June 17, 2010. This court's opinion on McLaughlin's appeal and the DOC's July 2, 2010 withdrawal of the disciplinary charges against Tubby and Rodriguez were not considered.[3] Relying in part on the officers' suspensions for "inappropriate physical conduct or mistreatment," and stating that they were "found to have used deadly force" without a "predicate basis for such force," the Attorney General's designee concluded that the officers' actions "constituted willful misconduct under *N.J.S.A.* 59:10A–2(b)" and "actual malice under *N.J.S.A.* 59:10A–2(b)."

---

[3] In fairness, we stress that there is nothing suggesting that the Assistant Attorney General who signed the decision had actual knowledge that the disciplinary charges against Tubby and Rodriguez had been dismissed on July 2.

The record does not indicate when the Attorney General's decisions dated November 16, 2010 were served on the officers. But on January 5, 2011, Rodriguez's attorney wrote to the Attorney General's designee and requested reconsideration based on information not considered—specifically, the Mercer County Prosecutor's decision not to bring charges and the DOC's dismissal of the disciplinary charges. The Attorney General's designee did not respond, and the officers filed their respective notices of appeal with this court on January 28 and February 2.

## II

■ Before addressing the merits, we reject the Attorney General's request for a dismissal of the appeals as untimely.

As noted above, the record does not indicate when the Attorney General's decision was served, and pursuant to *Rule* 2:4–1(b), upon which the Attorney General relies, the time for appeal runs not from the date of an administrative decision but from the date "of *service* of the decision or notice of the action taken." (emphasis added). Even if we were to assume that the decisions were mailed on the date written and received in due course, Rodriguez's motion for reconsideration, which tolled the time to appeal until the motion was resolved, *R.* 2:4–3(b), was filed well within the thirty-day period during which this court may extend the time to file an appeal. *R.* 2:4–4(a). The Attorney General's reliance on *In re Hill,* 241 *N.J.Super.* 367, 371, 575 *A.*2d 42 (App.Div.1990), a case in which a motion for reconsideration was filed beyond the *Rule* 2:4–4(a) thirty-day period, is entirely misplaced. Although Tubby did not seek reconsideration, Rodriguez's request for reconsideration implicates Tubby's case as well.

Because the Attorney General's obligation to address questions of representation in accordance with *N.J.S.A.* 59:10A–2 and *Prado* is a matter of public importance and interest, especially in civil litigation involving allegations of correctional officers' use of excessive force, we decline to dismiss either appeal. *Rumana v. Cnty. of Passaic,* 397 *N.J.Super.* 157, 171, 936 *A.*2d 971 (App.Div.2007).

In making that determination, we have also considered the fact that the right to seek judicial review of administrative action is of constitutional dimension. *Hirth v. City of Hoboken*, 337 *N.J.Super.* 149, 160, 766 *A.*2d 803 (App.Div.2001).

### III.

The procedures employed in this case and the Attorney General's application of the legal standards in denying these officers' representation raise significant questions.

 The Attorney General's duty to provide representation for State employees is statutory. Ordinarily, the Attorney General must "provide for the defense of any action brought against" a state employee "on account of an act or omission in the scope of his employment." *N.J.S.A.* 59:10A–1. There are, however, three statutory exceptions to the duty, *N.J.S.A.* 59:10A–2(a)–(c), and the Attorney General may deny representation on a finding "that it is more probable than not that one" of those exceptions applies. *Prado, supra,* 186 *N.J.* at 427, 895 *A.*2d 1154. The "burden ... is on the Attorney General to articulate reasons for not providing a defense," and the Attorney General must give the employee a written decision stating the reasons. *Id.* at 426–27, 895 *A.*2d 1154. On a subsequent appeal, this court must give the Attorney General's decision deference and affirm "unless 'it is arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole.'" *Id.* at 427, 895 *A.*2d 1154 (quoting *In re Taylor,* 158 *N.J.* 644, 657, 731 *A.*2d 35 (1999)).

 The Attorney General is expected to make a determination about representation "shortly after" the request is filed and on the "limited record" available even when it "consist[s] only of the complaint, an internal investigation by a state agency, and the employee's submissions." *Id.* at 423–24, 895 *A.*2d 1154. These decisions were not promptly rendered. As noted above, the requests for representation were filed in June, and the Attorney General did not make a decision until mid-November. Because

the Attorney General relied exclusively on evidential materials available when the requests for representation were filed, the delay is not explained by evidence gathering.

In this case, the delay raises a question about the Attorney General's obligation to verify the continued accuracy of the initial information upon which the Attorney General relies to justify a denial of representation. The charges against McLaughlin and the officers were mentioned in the report of SID's investigator. As a function of the well-settled rights of inmates and State employees to challenge decisions of State agencies imposing discipline, initial charges may be dismissed, modified or reversed. Moreover, along the way to a final decision, factual issues may be resolved that reduce the need to speculate about probable resolution of disputed facts. That is what happened here.

*Prado* permits a decision on a scant record in the interest of a prompt decision on representation. *Id.* at 424, 895 *A.*2d 1154. It does not suggest that a decision may be grounded on information that is no longer accurate.

For the foregoing reasons, we conclude that before the Attorney General denies representation based on an agency's investigatory report and records of disciplinary charges that are not yet final, the continued accuracy of information that is material to the denial and was subject to change while the request was pending should be confirmed. The obligation to update disciplinary records relied upon to support a denial of representation is consistent with *Prado*'s allocation of the burden of proof and its requirement that a denial be supported by credible evidence in the record as a whole. *Id.* at 427, 895 *A.*2d 1154.

This obligation is not overly burdensome or time-consuming. It requires contact with the State agency that supplied the information in the first instance or with the deputy or assistant attorney general who represents the agency in the event of an appeal to this court from the agency's final decision. We do not suggest that the Attorney General must postpone the decision to await the

final outcome, but when the final outcome is known at the time of the decision, the Attorney General cannot rely on assertions about disciplinary actions that have been altered.

In this case, the Attorney General's designee relied in part on the fact that the officers were disciplined even though the DOC withdrew the charges one week after the requests for representation were filed. In addition, the designee relied on the SID investigator's conclusions about the conduct of McLaughlin and the officers that were inconsistent with the findings in McLaughlin's disciplinary action that were affirmed on appeal. As noted above, this court determined that there was adequate support in the record for the following findings that the DOC had made about McLaughlin's conduct and the officers' responses: the inmate " 'turned around in an aggressive manner causing the attending staff to restrain the inmate,' " and the officers " 'believe[d] that an assault by the inmate was imminent and the inmate had to be restrained' and that '[t]he inmate's actions . . . placed the staff and the inmate's safety in jeopardy.' " In fact, the Attorney General, representing the DOC, urged us to affirm the DOC's determination based on those findings.

We recognize that the Attorney General's designee may have misread *Prado* and concluded that the decision could be made only on the basis of the record available on the date of the request. But once Rodriguez asked for reconsideration on the ground that the DOC had withdrawn the charges, it was arbitrary to ignore the information.[4]

Considering the record as a whole, by which we mean the record as supplemented on the motion for reconsideration and on appeal without objection from the Attorney General, we conclude

[4] While we recognize that *Prado* makes representation the rule and denial an exception that the Attorney General is obligated to justify, *Prado* also indicates that a state employee seeking representation may submit materials for the Attorney General's consideration. It is unclear why Tubby and Rodriguez did not immediately bring the dismissal of their disciplinary charges to the attention of the Attorney General.

that several of the Attorney General's findings deemed material and critical to these denials of representation are not supported by the record.

Apart from the fact that material factual findings are contradicted by the record, the Attorney General's legal conclusions cannot be sustained on this record.

As noted above, the Attorney General relied on an exception that applies when an employee has engaged in "willful misconduct" or acted with "actual malice." *N.J.S.A.* 59:10A-2(b). In both cases, the Attorney General found that it was more probable than not that the "alleged conduct" fell within those exceptions.[5]

The terms "willful misconduct" and "actual malice" appear in several provisions of the Tort Claims Act. *See, e.g., N.J.S.A.* 59:2-10 (excusing public entity from liability for acts of its employees in either circumstance); *N.J.S.A.* 59:3-14 (excluding protection from liability for the employee in either circumstance); *N.J.S.A.* 59:10A-2 (authorizing denial of representation). Despite their importance, the Act does not define them. Judicial decisions provide guidance.

In a civil action alleging injury caused by a law enforcement officer's violation of the law or departmental policy, "willful misconduct" has been construed to mean " 'the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden.' " *Fielder v. Stonack*, 141 *N.J.* 101, 124, 661 *A.*2d 231 (1995) (quoting *Marley v. Borough of Palmyra*, 193 *N.J.Super.* 271, 294-95, 473 *A.*2d 554 (Law Div.1983)). Where application of a rule distinguishing permissible and impermissible conduct is dependent upon the officer's reasonable belief in a threat of danger, "a mere error in judgment" does not suffice. *Fielder, supra*, 141 *N.J.* at 125 n. 5, 661 *A.*2d 231 (discussing regulations governing a

---

[5] The reference to "alleged conduct" suggests a singular focus on the allegations in the civil complaint that is improper under *Prado*, but as we understand the decisions, the Attorney General's designee did focus on the evidence before her, outdated as it was.

police pursuit, which is analogous to the use of force to subdue an inmate); *see id.* at 125, 661 *A.*2d 231 (noting that differences in situations warrant differences in the "application of willful misconduct"). Thus, even when an officer mistakenly assesses danger material to the permissibility of conduct in the situation, there is "no willful misconduct." *Id.* at 129, 661 *A.*2d 231.

In the context of alleged use of excessive force, the Court has suggested that it can be attributed to "actual malice" or "willful misconduct" when it "involv[es] deliberate and totally outrageous behavior." *Moya v. City of New Brunswick,* 90 *N.J.* 491, 504 n. 8, 448 *A.*2d 999 (1982) (discussing, in dicta, the scope of *N.J.S.A.* 59:3–14's limitation on the Tort Claims Act's protection). This standard is consistent with the statutory definition of "actual malice" relevant to assessment of punitive damages; in that statutory scheme, " '[a]ctual malice' means an intentional wrongdoing in the sense of an evil-minded act." *N.J.S.A.* 2A:15–5.10.

Applying the foregoing standards, the record does not permit the conclusion that this case involves conduct that probably amounts to willful misconduct or action taken with actual malice. *Prado* does not allow a denial simply because the record, viewed in the light most favorable to a denial of representation, permits a finding of willful misconduct or actual malice. The question is whether conduct of that sort is "more probable than not." *Prado, supra,* 186 *N.J.* at 427, 895 *A.*2d 1154. Given the disciplinary findings against McLaughlin—that he gave the officers cause to restrain him and believe that an assault by him was imminent and posed a danger—it is at least as probable that any excessive use of force was a product of an error in judgment or an accidental landing of a baton on his head during the struggle at the wall. The DOC's withdrawal of the disciplinary charges against the officers further supports this conclusion, because it is unlikely that the DOC would decline to continue the disciplinary process against these officers if it believed there actions were the product of willful misconduct or actual malice.

Because the record is inadequate to permit a denial of representation under the controlling standards, we reverse.